**ANTHONY POOLS, A DIVISION OF ANTHONY INDUSTRIES, INC., Appellant,**

v.

**CHARLES & DAVID, INC., Appellee.**

No. A14–88–01015–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 9, 1990.

Rehearing Denied Oct. 18, 1990.

---

Daniel K. Hedges, Richard O. Patterson, John Wesley Wauson, Houston, for appellant.

Alan F. Levin, Lester R. Buzbee, III, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and MURPHY, JJ.

## OPINION

JUNELL, Justice.

This is an appeal from a judgment on a jury verdict which found appellant had tortiously interfered with certain of appellee's contractual rights. Appellant brings six points of error alleging: (1) appellant was privileged to act as it did; (2) no evidence to support the jury findings; (3) insufficient evidence to support the jury findings; (4) improperly admitted evidence; (5) improper award of punitive damages; and (6) jury misconduct in the form of a quotient verdict. We reverse and remand.

The undisputed facts are: Appellee is a Texas corporation owned one-half by each of two brothers, Charles Davidoff and David Davidoff. The corporation was formed in early 1982 for the sole purpose of acquiring certain assets of appellant, including five retail sales and service centers which sold "after-market" swimming pool equipment, repair parts, chemicals and supplies, and the nonexclusive right to use appellant's name as an authorized dealer of appellant, Anthony Pools ("Anthony") [which characterized itself as the world's largest builder of swimming pools]. Appellee operated the purchased business for two years under the name of "Dolphin Pool Care Centers" during which time Anthony referred business to Dolphin from a customer base consisting of purchasers of new Anthony pools who required pool "start-up" and owners whose pool warranties had lapsed. In 1984, the Davidoffs sought a buyer for Dolphin so that they might retire. They began negotiations for the sale of the business to an interested buyer, Lex Webernick. During negotiations, Charles & David obtained the written approval of Anthony to have Webernick become an authorized dealer at all the Dolphin retail and service locations. The sale was never consummated.

At issue was whether a valid contract existed between Charles & David and Webernick, and whether appellant Anthony tortiously interfered with any such existing purchase and sale contract. While Charles & David, Inc. sued Anthony[1] on several different theories of recovery, only the question of tortious interference with an existing contract went to the jury. Appellant's points of error are mainly concerned with the sufficiency of the evidence to support the jury findings on that single theory.

Generally, there must be a valid contract in order to maintain an action for tortious interference with an existing contract. Specifically, four elements must be established:

(1) a contract existed;

(2) willful and intentional interference by the defendant;[2]

(3) the intentional act was a proximate cause of the plaintiff's damages; and

(4) actual damages[3] or loss occurred.

*Bellefonte Underwriters Ins. Co. v. Brown,* 663 S.W.2d 562, 573 (Tex.App.—Houston [14th Dist.] 1983), *rev'd on other grounds,* 704 S.W.2d 742 (Tex.1986); *Walner v. Baskin–Robbins Ice Cream Co.,* 514 F.Supp. 1028 (N.D.Tex.1981).

*Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989).

---

**1.** There originally was an additional defendant in the lawsuit (a competing Anthony dealer) with whom appellee settled.

**2.** The defendant must be shown to have maliciously interfered with the contractual relationship without legal justification or excuse, with "malice" being defined as an act without excuse or just cause. *Sakowitz v. Steck,* 669 S.W.2d 105, 107 (Tex.1984), *overruled on other grounds,*

**3.** To support a recovery of punitive damages there must be a finding of actual malice, defined as "ill will, spite, evil motive, or purposing the injuring of another." *Armendariz v. Mora,* 553 S.W.2d 400, 407 (Tex.App.—El Paso 1977, writ ref'd n.r.e.), quoting *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969).

We find the following sources of evidence in the record:

1. Live testimony at trial by:
   a. **Charles Davidoff,** one of the two shareholders of appellee.
   b. **Frank Shaw,** appellee's attorney who participated in drawing up documents related to the potential sale of the business,.
   c. **Joseph Wentzell,** the attorney who acted for the prospective buyer in the potential transaction.
   d. **Neva "Dusty" Snelling,** an employee of the prospective buyer, Webernick.
   e. **Floyd Carden,** Anthony's general manager for the Houston area.
2. The prospective buyer's **deposition** taken on August 19, 1987, (read into the record).
3. The prospective buyer's **affidavit** dated May 4, 1985, attached to his August 19, 1987 deposition, (recited below).

We have reviewed each of the above and find the following relevant evidence reached the jury:

### CHARLES DAVIDOFF'S TESTIMONY

The Davidoffs decided in 1984 to sell the business. Charles immediately informed Anthony's Houston representative, Floyd Carden, who saw no problems with their decision. In June, 1984, a prospective buyer showed serious interest in purchasing. The prospective buyer, Webernick, brought his banker on two occasions to look at the Dolphin facilities and to examine the business records. Later, Webernick interviewed all the Dolphin store managers and brought his secretary to collect more financial information. In August 1984, Charles and Webernick met with Floyd Carden. Webernick learned at that meeting he would not have any problems in becoming an Anthony dealer if he bought the business of Charles & David. Assisted by counsel, Webernick made a written offer to the Davidoffs. The price in the offer was unsatisfactory to the Davidoff brothers.

The price then was negotiated upward to a level which was finally agreed upon by handshake. The agreed price was the resale inventory on the closing date, to be valued at cost, plus $400,000 for all other tangible and intangible property. The parties each engaged a lawyer to draft the necessary documents to complete a purchase and sale.

While formal documents were being prepared by the attorneys, Webernick moved into the offices of Charles & David, using them as his mailing address. He brought his secretary with him and began to conduct his existing business from the Dolphin location. He stored his own fixtures and inventory in a warehouse on the rear of the Dolphin premises, met with the landlord of at least one Dolphin retail location to negotiate the lease, and hired a general manager for Dolphin. Charles knew of nothing which would prevent the transaction from closing. After Anthony's written approval of Webernick as a successor to Charles & David, Inc., it only would have been necessary to take an inventory of merchandise on hand, price it, sign documents, and transfer money. The closing was set for October 18, 1984, at the earliest and October 31 at the latest.[4]

Charles became concerned in mid-October 1984, when Floyd Carden announced that Anthony's California headquarters intended to make a geographic split of the Houston market into two parts, north and south, with the east/west line to be drawn at Interstate Highway 10 which intersects the city. The problem presented by this announcement was that one of the more profitable Dolphin stores to be sold was located north of I–10 in the "FM 1960 area". Charles testified that Carden told him that the 1960 Dolphin store would have to be sold to another dealer selected by Anthony to serve the north zone. Failure to sell the FM1960 store to that competing dealer would result in no further Anthony customer referrals to Charles & David, or Webernick, at that store. Carden had

---

**4.** A copy of the unsigned asset purchase agreement was allowed into evidence for the *sole* purpose of showing Charles' state of mind with respect to the transaction.

known for two months before the announcement to split the territory that there was a pending sale of all the Dolphin stores operated by Charles & David to Webernick. Anthony had given its written approval for Webernick to become an Anthony dealer at all such stores operated by Charles & David a few weeks prior to the announcement of the decision to split the territory.

The deal with Webernick fell apart upon news of the decision to divide the Houston territory. Charles then began closing Dolphin stores after advising Carden, Anthony's representative, and obtaining his consent. Without any preliminary warning, on December 31, 1984, Anthony's California headquarters gave letter notice terminating the Charles & David dealership.[5]

Anthony then established two new dealerships in Houston to which Anthony made all its new business referrals. No further sales of chemicals or replacement parts were made by Anthony to Charles & David, Inc. Between December 1984, and August 1985, Charles & David liquidated its inventory. It also sold its operating assets to Webernick. However, this latter sale was not done under the terms of the negotiated but unsigned purchase and sale agreement. A total of only $93,000 was realized by Charles & David, Inc. in its liquidation and sale. All of this money was used to pay the corporation's debts. Charles (age 60 at date of trial) went to work for another pool supply company owned by his two sons. David (age 69) was too ill to work. His only known future income source was social security. (There was testimony that both of the Davidoff brothers had open heart surgery with quadruple bypass.)

On cross-examination, Charles could not say there was any other agreement between Anthony and Charles & David, Inc., besides the written agreement which gave Anthony the right to terminate the relationship upon 30 days notice, or to operate competing retail sales offices outside a two mile radius of those maintained by Charles & David.

5. The first paragraph of the Anthony letter reads: "Due to your desire to sell Dolphin Pools and the closing of several service/retail loca-

## FRANK SHAW'S TESTIMONY

Attorney Shaw represented the Davidoff brothers in the 1982 acquisition of the dealership from Anthony. He also acted for them in the proposed sale of the six Dolphin locations to Lex Webernick in 1984. Webernick's attorney prepared the purchase agreement and Mr. Shaw reviewed it and negotiated changes on behalf of the Davidoffs. The price agreed upon was $400,000 plus the value of inventory held for resale. Mr. Shaw testified that an October 1, 1984, letter had been received from Anthony approving Webernick as transferee of the non-exclusive Anthony dealership. The purchase agreement was final and the transaction was initially set to close October 18, or 19, 1984. The closing was rescheduled for October 26, or 27, 1984. The transaction was later called off completely.

## JOSEPH WENTZELL'S TESTIMONY

Attorney Wentzell was engaged by Lex Webernick to prepare an agreement for the purchase of six Dolphin stores and the non-exclusive Anthony dealership operated by Charles & David, Inc. The price, to be payable in cash at closing, was set at $400,000 plus the value of inventory held for resale, anticipated to be between $100,000 and $125,000. Mssrs. Wentzell and Shaw reached agreement on the final form of the purchase documents subject only to the approval by Anthony of Webernick as successor to Charles & David. Subject to that approval, which was received, everything was ready to sign at a closing set for October 18 or 19, 1984. The closing was reset for October 26 or 27, 1984, after Mr. Wentzell's wife became scheduled for surgery on October 19. Before the new closing date arrived, Webernick learned that the most profitable Dolphin store would not be part of his territory. As a consequence, the transaction never was consummated.

tions we feel the need to cease doing business with you, effective February 1, 1985."

## NEVA SNELLING'S TESTIMONY

Ms. Snelling testified that both parties to the lawsuit tried to subpoena Lex Webernick to testify at trial but that Webernick became unavailable in Dallas. She was hired by Webernick in September 1984, to work at Dolphin. She made evaluations of each of the six stores then owned by Charles & David, Inc., including the terms of its facility leases. She also made financial projections, designed an advertising campaign, and planned expanded store services. Until the time of Anthony's letter of approval in October 1984, she was under the impression that Webernick was acquiring an exclusive Anthony dealership. Anthony's later decision to divide the Houston territory at Interstate Highway 10 was the point at which the deal "cratered." She said the deal made no sense without the FM1960 store in the picture.

## FLOYD CARDEN'S TESTIMONY

Mr. Carden was with Anthony Pools for twenty years in various capacities including the managing of new pool construction in Houston. He knew the details of the 1982 purchase of the Anthony's dealership by the Davidoffs. Lex Webernick had expressed to him an interest in purchasing the Dolphin business. Mr. Carden was aware that negotiations had taken place, however he denied knowledge of the existence of any contract between Webernick and Charles & David, Inc. and said he never had done anything to discourage the purchase and sale. He confirmed the fact that Anthony's California headquarters decided to divide the Houston territory. He prepared a map suggesting geographic boundaries for use in that decision. He said he took no part in the December 31, 1984, termination of the Charles & David dealership. He was confronted with his earlier interrogatory which showed it was he who personally decided to terminate the agreement. He refused to change his answer when faced with the language of the interrogatory. He continued to insist that the decision to terminate came from Anthony's California headquarters.

## DEPOSITION OF LEX WEBERNICK

The Webernick deposition of August 19, 1987, was initially offered only in part by the defense. However, upon a request by Charles & David for optional completeness, the trial court asked Anthony's attorney to read the entire deposition into the record without suggesting any means to identify which parts of the deposition were being offered by each of the two parties. Mr. Webernick was managing a pool service and supply business in July 1984, when he learned from a Dolphin employee that the Davidoffs wanted to sell their six Dolphin locations. Negotiations between Webernick and Charles Davidoff ensued. Webernick reviewed a substantial volume of financial data on the Charles & David business. An asking price of $650,000 was proposed. A price of $400,000 was finally agreed upon for the tangible and intangible operating assets, plus inventory values to be determined at closing. Of the $400,000, Webernick testified approximately $270,000 was attributed to "goodwill". He had arranged for financing through a Houston bank. Webernick understood that all of Anthony's referral business in Houston was going to Dolphin and that Dolphin was the only authorized Anthony dealer in Houston. The agreement with Charles & David was made on the assumption, and subject to the contingency, that Webernick would become the sole and exclusive Anthony dealer in Houston and that he would get all of Anthony's Houston referrals. Webernick said Anthony's representatives told him he would continue to get Anthony's Houston referral business. In the late summer or fall of 1984, Webernick heard there was another pool supply company in the Houston area receiving Anthony's referrals. Webernick then asked Anthony for clarification and learned for the first time that the 1982 purchase agreement between Anthony and Charles & David, Inc. did not create an exclusive Anthony dealership in the Houston area. Anthony's representatives told Webernick that another dealer would serve the northern area of Houston and that no further referrals would go to the FM1960 store operated by Charles & David. If Webernick bought the

Dolphin business and became an Anthony dealer, he would not get referrals north of Interstate Highway 10. Floyd Carden told him the Houston area was too large for a single Anthony dealer to handle and suggested that future operators of the north and south zones of Houston could cooperate by referring business to each other. Anthony did not suggest that a south zone dealer or service center would be precluded from responding to a service call from a customer in the north zone, or vice versa. Webernick confronted the Davidoffs with the news of no further Anthony referrals to the FM1960 store. Negotiations were reactivated for two or three weeks into November 1984. No purchase and sale resulted, however.

Attached to the Webernick deposition as an exhibit was an earlier affidavit of Webernick. (See below.) Webernick acknowledged in his deposition that the affidavit was prepared by attorneys for Charles & David, Inc., and that counsel for Anthony had not been present when he made that sworn statement.

## AFFIDAVIT OF LEX WEBERNICK

Webernick's statement was taken on May 4, 1985, at the offices of appellee's trial counsel and was sworn to before Notary Public Frank Shaw (the previous attorney for Charles & David, Inc.). The portions shown in italics below were quoted or paraphrased to the jury by plaintiff's counsel during final argument. However, the full text of the affidavit went to the jury room. The affidavit states the following:

About ten (10) years ago, I was employed by Anthony Pools, a division of Anthony Industries, Inc. Charles and David Davidoff were plumbing subcontractors on numerous Anthony Pool installations, and I became acquainted with the Davidoffs in this manner.

In July 1984, I heard that the Davidoffs were interested in selling their pool service and retail business, known as Dolphin Pool Care Centers. In late July, I contacted Charles Davidoff concerning what I had heard. Charles confirmed that they were interested in selling the business, and we began negotiating for possible purchase of Charles & David, Inc.'s six retail stores and the included service business. I worked directly with Charles & David Davidoff on this matter. I also had my own attorney.

Charles & David, Inc., allowed my CPA to inspect its books and records, and based upon the income and expenses shown in those records, we agreed on a purchase price of FOUR HUNDRED THOUSAND DOLLARS ($400,000) plus the cost of inventory, a total expected cost of approximately FIVE HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($525,000).

I knew that the Dolphin Pool Care Centers were an authorized Anthony Pools service and retail outlet. This Anthony affiliation was a very important part of the sale. I knew that I would have to obtain Anthony's approval to continue as an authorized Anthony Service Center and equipment dealer if I purchased the Dolphin Centers from Charles & David, Inc., so I requested Charles & David, Inc. to obtain a letter from Anthony authorizing me to takeover [sic] their stores and continue as an authorized Anthony dealer. *I was not prepared to reach a final deal with Charles & David, Inc., until Anthony provided this letter of approval to me.* We called the California home office of Anthony Pools, and then contacted Mr. Floyd Carden, Anthony's Houston General Manager, who gave his verbal approval of the transfer from Charles & David, Inc. to me subject to written approval from the California home office.

Shortly after October 1, 1984, Charles & David, Inc. received a letter dated October 1, 1984 from Anthony Pools, in which I was approved as an authorized service dealer at "all retail and service locations formerly occupied" by Charles & David, Inc., in the Houston area. I was provided a copy of the letter. *By that point, I* had *reached* full agreement with Charles & David, Inc., on all *terms and conditions of my purchase and their sale of the Dolphin Pool Care Centers* business. A formal written contract had

been prepared by the Charles & David, Inc. attorney, working with my attorney. *This written agreement, which I read and was prepared to sign, fully and accurately set forth the terms and conditions previously agreed to between Charles & David, Inc., and myself. I had spoken with two different banks concerning financing for this purchase, and had arranged all the necessary bank financing* which would have allowed me to purchase the Dolphin Pool Care Centers on the agreed upon terms, and *I was fully prepared to complete this sale after seeing Anthony's letter of October 1, 1984. In fact, we had scheduled a closing date for October 26 or 27, 1984,* but in no event later than October 31, 1984. *The deal was so close to being made that I moved my business headquarters into the Charles & David, Inc. location at 7801* Westheimer *and began operating from there awaiting the closing. I was receiving calls and mail there.*

*I already knew that there were other Anthony Service Centers in Houston besides the Dolphin Pool Care Centers owned by Charles & David, Inc. Early in October 1984, after receiving Anthony's October 1, 1984 letter, I learned that Jim Dunnigan was also buying equipment and supplies from Anthony Pools, and was operating as another Anthony Service Center. I became curious about* Anthony's plans for *these other dealers, and called Floyd Carden to obtain further information. Floyd* told me that Anthony was planning to divide the City of Houston *into two or three exclusive zones or territories. This was the first time I had ever heard anything about* any *territorial division for Anthony Service Dealers. Up to this point, my deal* with Charles & David, Inc. *was ready to go, and would have been concluded if I had not been told of Anthony's decision to divide the city into exclusive territories.*

*Around October 17, 1984, Floyd Carden told me that the zones* for the City of Houston *had been definitely set,* and that *I would have to call Jim Dunnigan*

about the Dolphin Center located at *2604 FM 1960 West in Houston. Floyd told me that if I bought this particular location, I could expect to have this location pulled away from me by Anthony. Floyd essentially said that I would lose this store if I bought it.*

*I called* Floyd *Carden back the next day about this* disturbing development, and *Floyd said that I would have to sell or lease the FM 1960 location to Jim Dunnigan, because Dunnigan had been given the entire* Anthony *territory north of Interstate 10 in the City of Houston and Harris County, Texas. Floyd Carden said that Anthony was going to split the city along I–10, into north and south zones. Floyd further said* that if neither I nor Charles & David, Inc., would sell the FM 1960 store to Jim Dunnigan, *Anthony would withdraw its support from this store, and* would *not refer any service customers or* new customer *start-ups to the* FM *1960 store. It was clear to me that I would have no choice but to sell the* FM *1960 store to Jim Dunnigan or face Anthony's retaliation and lack of cooperation.*

*After hearing Floyd Carden's threats,* I reexamined *the financial aspects of my purchase from Charles & David,* Inc. With the FM 1960 store *removed from the sale, the deal was no longer attractive. In fact, without the revenue from that store, it would have been* impossible to [sic] *for me to make the payments on the notes I would have executed to Charles & David, Inc. When it became apparent that Anthony would not allow me to operate* as an Anthony Service Dealer at *the* FM *1960 store, even though Anthony had already given approval for me to do so in its October 1st letter, I decided not to proceed with the purchase from Charles & David, Inc. on the previously agreed terms. If Floyd Carden had not interfered in the way he did, I would have closed the deal with Charles & David, Inc. as scheduled.*

Attached hereto, and incorporated herein, are true and accurate copies of the

approved but unexecuted purchase documents between Charles & David, Inc. and myself. Also enclosed is a true and accurate copy of the October 1, 1984 letter from Anthony. I have initialled each page for identification only.

The affidavit set forth above was only referred to in the Webernick deposition read into the record. The affidavit itself was not read into the record. The affidavit initially was offered only to impeach statements in the Webernick deposition, but was ultimately admitted by the court over appellant's objection, to be given weight alongside the deposition and its weight. The court said to the jury:

> "I'm going to admit it [the affidavit], and you may give it whatever weight. It's the same person whose deposition they just read. You can consider the deposition testimony, give it whatever weight and consider this [the affidavit] and give it whatever weight. You are the triers of fact that we have faith in."

An expert witness was called to place a "going concern" value on the Dolphin business of Charles & David, Inc. as of October, 1984. She placed such a value at between $375,000 and $425,000, plus the value of inventory held for resale. However, she never reviewed the drafted asset purchase agreement and gave no testimony thereon. Nor did she value the Dolphin business of Charles & David after the purchase and sale transaction faltered and failed.

Ten of the twelve jurors returned answers to special issues as follows:

**6.** By the term "contract," as used in this issue is meant a promise, or set of promises, oral or written, for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.

**7.** By the term "tortiously interfered with contractual rights" as used in this issue is meant such conduct or action which has as its purpose to influence others not to carry out the terms and conditions of the contract with the injured party or to prevent the injured party in carrying out the terms and conditions of the contract *without just cause* or consent of the injured party. (Emphasis added.)

**SPECIAL ISSUE NO. 1:**

Do you find from a preponderance of the evidence that Charles & David, Inc., made a contract [6] with Lex Webernick to buy the ongoing business known as Dolphin Pool Care Centers?

**ANSWER: Yes**

**SPECIAL ISSUE NO. 2:** (Conditioned on a "Yes" to No. 1)

Do you find from a preponderance of the evidence that Anthony Pools tortiously interfered [7] with the contractual rights of Charles & David, Inc., that existed in the contract you found existed in Special Issue No. 1?

**ANSWER: Yes**

**SPECIAL ISSUE NO. 3:** (Conditioned on a "Yes" to No. 2)

What sum of money, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate Charles & David, Inc., for its loss, if any, proximately [8] caused by Anthony's interference, if any, you have found?

**ANSWER: $420,000**

**SPECIAL ISSUE NO. 4:** (Conditioned on a "Yes" to No. 2)

Do you find from a preponderance of the evidence that Anthony's interference, if any you have found, was committed maliciously [9] or with conscious indiffer-

**8.** By the term "proximate cause," as used in this charge, is meant a cause which in a natural and continuous sequence, produces an event and without which the event would not have occurred; and to be a proximate cause of an event, it should have been reasonably anticipated and foreseen by a person of ordinary care, and prudence, in the exercise of ordinary care, that the event or some similar event would occur as a natural and probable consequence. There may be more than one proximate cause.

**9.** You are instructed that malice does not mean actual ill will or hatred, but rather is a wrongful act, intentionally done, without just cause or excuse.

ence[10] to the rights and welfare of Charles & David, Inc.?

ANSWER: **Yes**

SPECIAL ISSUE NO. 5: (Conditioned on a "Yes" to No. 4)

What sum of money, if any, should Anthony pay to Charles & David, Inc., as punitive damages?

ANSWER: **$100,000**

Judgment was rendered on the verdict. Pre-judgment interest from October 31, 1984 was also awarded, along with post-judgment interest from the date of judgment, July 27, 1988.

In its first point of error Anthony asserts the trial court erred in rendering judgment against Anthony because as a matter of law Anthony was privileged to act as it did. Anthony makes several different arguments under point one. However, they are based essentially on the contention that the contract provision giving either party the right to terminate the contract upon thirty days written notice afforded Anthony the right to terminate the Charles & David dealership in any territory north of Interstate 10, including specifically the FM1960 store.

In effect Anthony's contention is that its right to totally and completely terminate the contract with Charles & David included the right to a partial termination. While the parties to this case have not stated the issue in this manner, we think it is the principal question presented to this court in appellant's first point of error. Our research in this case leads us to the conclusion that any decision on this principal question first requires a determination of whether the contract between Anthony and Charles & David, Inc. is a "divisible" contract, as distinguished from an indivisible contract.[11] The issue of contract divisibili-

ty was not raised or developed at trial. Because we are reversing and remanding for the reasons set forth below, the issue can be raised and developed at a new trial at which evidence may be brought concerning whether or not the contract is divisible. Under the circumstances, we do not pass on the first point of error.

■ Appellant's second point of error alleges there was no evidence to support the jury findings. In considering a "no evidence" point of error we consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *Id.*

■ With respect to proof of the four elements of tortious interference with an existing contract, we find: (1) there is some evidence that the parties had reached a meeting of the minds and that a closing would have taken place on a specified date but for a factor which was external to the transaction, the surgery of the wife of the attorney for the buyer; (2) there is some evidence that Anthony willfully and intentionally interfered with a known contract between the parties by announcing its decision to withdraw support for one of the locations for which Anthony previously had given written approval for the buyer to operate; (3) there is some evidence that Charles & David suffered a loss of the sale of the business because of acts of Anthony; and (4) there is some evidence that prior to the acts of Anthony the business had a value of as much as $425,000 (plus the value of inventory anticipated to be approximately $125,000), and that only $93,000 was subsequently realized by Charles & David upon liquidation of all the assets.

10. You are further instructed that conscious indifference denotes a decision, in the face of an impending harm to another party, not to care about the consequences of the act which may ultimately lead to that harm.

11. See 17A C.J.S. *Contracts* §§ 403, 404, 461 (1963); 17 Am.Jur.2d *Contracts* § 488 (1964); Re-

STATEMENT (SECOND) ) OF CONTRACTS § 183; 14 TEX. JUR. *Contracts* § 375; *Demaret v. Bennett,* 29 Tex. 262, 270–71 (1867); *O'Con v. Hightower,* 268 S.W.2d 321 (Tex.Civ.App.—San Antonio 1954, writ ref'd); *Slater v. Slater,* 208 AD 567, 204 N.Y.S. 112 (1924), aff'd 240 N.Y. 557, 148 N.E. 703 (1925).

Appellant's point of error number two is overruled.

In a third point of error Anthony argues factual insufficiency of the evidence to support the jury verdict. The appellate court must examine all the evidence, *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986), and, having considered and weighed all the evidence, will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The following evidence may be additive to that which we found supportive of the four elements reviewed in the preceding point of error. First, evidence that a contract had been agreed upon appears in the testimony of Charles Davidoff who said he was ready to sign the documents. Webernick said the parties had reached full agreement, and both attorneys testified that the contract was in final form and that a closing date had been set. Second, Anthony knew about negotiations for the formation of a contract, based upon the testimony of Carden; Anthony gave its written consent to have Webernick become assignee of the business; Charles Davidoff testified that Anthony was aware of the contract. It is undisputed that Anthony consciously made certain unfavorable disclosures to Webernick. Third, causal connection of appellee's loss to the acts of Anthony appears in the Webernick deposition. When Webernick learned of Anthony's plans for the FM1960 store, he backed out of the deal. Also, Neva Snelling testified that the transaction was not viable without a profitable FM1960 store. Fourth, an expert witness placed a value on the business before the anticipated sale. When the actual amount of liquidation proceeds is subtracted from that value, we are provided sufficient evidence to support a loss of value in the magnitude of that which was found by the jury. Appellant's point of error number three is overruled.

Appellant's fourth point of error argues that the affidavit of Lex Webernick was improperly admitted into evidence. Anthony asserts the affidavit was hearsay and that it should only have been admitted to impeach the Lex Webernick deposition. We agree. The Webernick affidavit preceded the Webernick deposition by more than two years. While the Webernick affidavit may trump the Webernick deposition as a fresher recollection of the events which took place, it is an out of court statement which is hearsay if offered to prove the truth of the matter asserted therein. TEX.R.CIV.EVID. 801. There was absolutely no way the affidavit could have been subjected to any cross-examination, a fact which places its reliability into extreme doubt. The basic principles which require trustworthy testimony for substantive evidence were not changed by adoption of the codified Rules of Evidence. *Truco Properties, Inc. v. Charlton*, 749 S.W.2d 893, 896 (Tex.App.—Texarkana 1988, writ denied). The affidavit fails to qualify under any of the "hearsay exceptions" of Rule 803, and could only be admissible under Rule 806 for the purpose of impeachment. Texas courts long have allowed the use of affidavits to impeach a witness. *See Trinity County Lumber Co. v. Denham*, 88 Tex. 203, 30 S.W. 856 (1895). The jury could have been allowed to consider any inconsistencies between the affidavit and the deposition as damaging to the credibility of the Webernick deposition, but not as substantive evidence. *Fultz v. First National Bank in Graham*, 388 S.W.2d 405 (Tex.1965); *Bradley v. Texas & P. Ry. Co.*, 1 S.W.2d 861 (Tex.Com.App.1928); *Richardson v. State*, 751 S.W.2d 663, 666 (Tex.App.—Houston [1st Dist.] 1988, pet. granted); *Atchison, Topeka & Santa Fe Ry. Co. v. Denton*, 475 S.W.2d 821, 826 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e); *Spring Branch Bank v. Wright*, 404 S.W.2d 659, 665 (Tex.Civ.App.—Houston 1966, writ ref'd n.r.e).

The affidavit contains inflammatory language which is inconsistent with the general tone and content of the Webernick deposition taken two years later. Upon timely request and objection, abundantly made in the case before us, the court was required to instruct the jury of the limited use to be made of the affidavit. This was not done. The jury was encouraged to weigh the affi-

davit along with the deposition. The affidavit went to the jury room. All of this was clearly error amounting to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). Appellant's fourth point of error is sustained.

 The fifth point of error urges that the record will not support an award of punitive damages. We agree. To support a recovery of punitive damages, absent fraud or other aggravating circumstances, "there must be a finding of actual malice: ill-will, spite, evil motive, or purposing the injuring of another". *Clements v. Withers*, 437 S.W.2d 818, 822 (Tex.1969). Here we have no allegations of fraud, and there is no evidence of any motive behind the acts of Anthony save that which is found in the Webernick deposition showing an inference that Anthony's decision to divide the Houston territory was in Anthony's own profit-motivated business interests to provide better service to its customers. Those interests, while self-serving, do not meet the criteria of "ill-will, spite, evil motive, or purposing the injuring of another". The act may have been willful, but not necessarily malicious. *Clements v. Withers*, 437 S.W.2d at 822. Appellant's fifth point of error is sustained.

In its sixth and final point of error appellant asserts jury misconduct, a subject which properly was developed in appellant's motion for new trial required by TEX.R.CIV.P. 324(b)(1). That motion was accompanied by the affidavit of one of the ten jurors who made findings in this case. The affidavit states that, during deliberation, each of the ten jurors wrote on a piece of paper their individual assessment of damages and that the ten amounts were averaged to get the $420,000 answer the jury brought forth in response to Special Issue No. 3. The affidavit does not say the jurors bound themselves in advance to agree with the results of that process. Merely averaging figures as a guideline for deliberation, without more, is not sufficient to warrant a new trial. *Hughett v. Dwyre*, 624 S.W.2d 401 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). The motion for new trial was noticed for hearing and was overruled by written order. While such a motion is a necessary prerequisite for appeal under TEX.R.CIV.P. 324(b)(1), there is no record of any evidentiary hearing by the trial court on the alleged jury misconduct. Such a hearing is mandatory under TEX.R.CIV.P. 327(a) in order for the trial court to hear evidence on the materiality of any alleged jury misconduct from which to determine the propriety of a new trial. In the absence of a record on such an evidentiary hearing, nothing is presented for appellate review. We also note that if a juror were to testify at an evidentiary hearing, he or she could not be permitted to comment on matters occurring during the course of jury deliberation. TEX.R.CIV.P. 327(b). The only matter that a juror may testify upon is whether any outside influence was improperly brought to bear upon any juror. The phrase "outside influence" means something other than influence of jurors on each other. *Marathon Oil Co. v. Sterner*, 777 S.W.2d 128, 134 (Tex.App.—Houston [14th Dist.] 1989, no writ). The complained of process employed by the jurors, if true, was the product of forces existing within the jurors themselves, and not brought about by outside influence. Appellant's final point of error is overruled.

The judgment of the trial court is reversed and the cause of action is remanded for a new trial.