James E. CARR, F. William Carr, and Wallace Skinner, Appellants,

v.

Ward HUNT, Stuart Hunt, C.E. "Doc" Cornutt, Donald J. Carter, Farmers Branch/Carrollton Flood Control District, Woodbine Development Corporation & Hunt Investment Corporation, Appellees.

No. 05-81-01154-CV.

Court of Appeals of Texas, Dallas.

April 25, 1983.

Rehearing Denied May 31, 1983.

James A. Ellis, Jr., Robert W. Coleman, Dallas, for appellants.

William D. Sims Jr., Gary E. Smith, Jack Pew, Jr., Dallas, for appellees.

Before STEPHENS, FISH and WHITHAM, JJ.

STEPHENS, Justice.

This appeal results from a successful suit brought by Ward Hunt and his father, Stuart Hunt, seeking to recover title to a certain tract of land in Dallas County, Texas. They contend that they had been induced to sell by fraudulent representations. Of the original eleven defendants sued, all but Wallace Skinner, James Carr, and William Carr were dismissed by rulings on various motions.

James and William Carr present thirteen points of error, and Wallace Skinner presents one hundred points of error for our review. Ward Hunt and his father present three cross points in the event the judgment of the trial court is reversed.

The Hunts sought recovery of their land on four distinct theories: (1) common law fraud in the inducement to sell, as attributed to appellants through a chain of agency; (2) statutory fraud under Tex.Bus. & Com.Code Ann. § 24.02; (3) statutory fraud under Tex.Bus. & Com.Code Ann. § 27.01; and (4) conspiracy of Skinner and Cornutt to defraud them of their property. Because we conclude that the evidence will not support recovery under any theory sought by the Hunts, we reverse and render. The Hunts' three crosspoints are overruled.

## GENERAL FACT SUMMARY

The Farmers Branch-Carrollton Flood Control District was created by a legislative act in 1974. Its purpose was to reclaim, for possible development, land which lay in the 100 year flood plain along the Trinity River.

At all times relevant to this matter, Paul Phy was an attorney for the district, and was also on the district engineering committee; C.E. "Doc" Cornutt was treasurer for the district, and was also on the engineering committee; and Wallace Skinner served as a "figurehead" president of the district.

At the time the district was formed, landowners in the district included the plaintiff Ward Hunt, who owned half of the property known as Tract 45; defendants Wallace Skinner, James Carr and William Carr, who were co-tenants in 340 acres, including 270 acres known as Tract 52; and Hunt Investment Corporation, which owned 470 acres, including 200 acres known as Tract 41. Defendants Doc Cornutt and John Scovell worked for Woodbine Development Corporation, which was owned by Hunt Investment Corporation.

It was in the interest of each landowner for the district to reclaim as much of their property as possible; therefore, each landowner wished to give up as little land as possible for construction of a levee, a sump storage lake, and a pump station, and wished to leave as little land outside the levee (and therefore in the floodplain) as possible. Thus, when the district's engineering committee prepared a plan of reclamation in October 1975, a controversy arose as to where the district would locate the sump storage lake. Skinner did not want to give up any more land from Tract 52, since 60 acres of that 270 acre tract would be used for a levee and 90 more acres had been left outside the levee, leaving only 120 acres of Tract 52 to be reclaimed. Cornutt did not want Hunt Investment Corporation to give up land from Tract 41.

The engineer, hired by the district to prepare the plan of reclamation, testified at trial that his chief recommendation was to locate the lake on Tract 52, because less work was needed to construct it there. Alternatively, a ditch on the adjacent property, Tract 51, could be enlarged so that all the lots would share water storage.

Tract 51 was the tract owned by the Hunts and is the subject of the present

dispute. On July 6, 1976, Ward Hunt, acting individually and as agent for his father, Stuart Hunt, bought 84 of the 89 acres in Tract 51 at a foreclosure sale, paying the price of $101,700, and was from that point the sole owner of record. Ward Hunt testified that he had previously studied the district's plan of reclamation, and therefore knew at the time of his purchase how much of Tract 51 might be reclaimed for development.

Within two weeks of the Hunts' purchase of Tract 51, Doc Cornutt informed Ward Hunt that the District wanted part of the tract for construction of the sump lake. He also told Hunt that it was the District's policy to pay $2500.00 per acre for property taken by condemnation. He represented that the District had recently condemned similar property and paid that price for it. However, in the present situation both parties wished to avoid condemnation proceedings, and on September 2, 1976, Cornutt and Hunt negotiated a sale price of $115,000.00, or approximately $1269.00 per acre, for the entire tract. It was not until October 18, 1976 that the District's Board of Directors authorized the acquisition of all land necessary for the reclamation project.

The closing of the Hunt sale was thereafter postponed until November 5, 1976, because, according to Cornutt, the District was having some difficulty raising the purchase money. At the closing, Ward Hunt was presented with three separate deeds to sign. One deed conveyed land under the proposed levee to the District, another conveyed the land inside the levee to Don Carter, Trustee, and the other conveyed the land outside the levee and in the flood plain to Don Carter. When Ward Hunt questioned the necessity of three deeds, he was told by Cornutt that Don Carter was acting as trustee for the District and was lending it the funds necessary to purchase the land inside the levee, and that the District would repay Don Carter in approximately a week and would then take title to the property. Relying on these representations, Ward Hunt executed the conveyances and closed the deal.

Prior to closing, while negotiations were still proceeding between Cornutt and Hunt for the purchase of Tract 51, Cornutt approached Skinner and informed him that he was trying to acquire Tract 51 from Hunt. Cornutt then proposed that Skinner consider trading 31 acres of his property in the adjacent Tract 52 for 31 acres in Tract 51. Cornutt told Skinner that such a trade would enable the District to put the sump lake on Tract 52, where the District's engineer had originally recommended that it go. Skinner did not then agree to this proposal, because Cornutt had not yet acquired Tract 51. William Carr, one of Skinner's co-tenants in Tract 52, testified that he first learned of the proposed exchange in October 1976, presumably through Skinner.

On November 8, 1976, three days after Ward Hunt had sold Tract 51, Cornutt told Skinner of the District's acquisition. Skinner then signed a letter prepared by Cornutt which notified the District that he and the Carrs were in agreement with the proposed exchange, although the Carrs had not yet agreed to it. Skinner then contacted the Carrs to discuss the proposed exchange. These discussions lasted about one week. On November 15, 1976, the District's Board of Directors approved the exchange of acreage between Tract 51 and Tract 52. On November 19, 1976, James Carr signed a deed to the District on behalf of himself and his brother William as co-tenants. On November 22, 1976, Skinner signed the deed to the District as co-tenant of the Carrs, and Cornutt delivered the Carter, Trustee deed for part of Tract 51 to Skinner for Skinner and the Carrs as co-tenants. Thus was the exchange completed.

On July 5, 1978, almost two years later, Ward Hunt signed a release of a 5 acre easement on Tract 51 over to Skinner and the Carrs. It was later that month that the sump lake was actually constructed, mostly on Tract 52, but also partially on Tract 51, in accordance with a new engineering recommendation made some time after the Hunt sale in November 1976. The easement release was necessary to allow construction of the lake on part of Tract 51.

Despite his execution of this release, Ward Hunt testified that he did not become aware of the fact that the District no longer owned Tract 51 until some time in late 1979, when he discovered that the sump lake lay in large part on Tract 52, not Tract 51 as he had been led to believe. The Hunts filed the present suit in December 1979.

### JURY FINDINGS

At the close of trial, the jury answered special issues which included the findings challenged on appeal: that Cornutt falsely and willfully told Ward Hunt of the District's intent to put a lake on Tract 51; that Cornutt falsely and willfully told Ward Hunt that Carter was the District's trustee and would deed Tract 51 to the District a week after closing; that these representations induced the sale of Tract 51 by Ward Hunt; that Cornutt acted as Skinner's agent in procuring Tract 51; that Skinner, in turn, was agent for the Carrs in the purchase of Tract 51; that Cornutt and Skinner were engaged in a conspiracy to defraud Ward Hunt; that Skinner knew or should have known of Cornutt's false statements to Ward Hunt; that Skinner knowingly benefited from Cornutt's false statements to Ward Hunt; and finally, that neither Skinner nor the Carrs were bona fide purchasers of Tract 51. Thus, the Hunts' claim to Tract 51 is based on a finding that Cornutt had committed actionable fraud in inducing the Hunts to sell their property.

### COMMON LAW FRAUD

It is evident from the special issues that the Hunts seek to establish the liability of Skinner and the Carrs through a chain of agency by showing that Cornutt, the person found by the jury to have made the false representation on which the Hunts relied, acted as agent for Skinner in procuring Tract 51, and that Skinner, in turn, acted as the Carrs' agent in the exchange of acreage in Tracts 51 and 52 between them and the District. Skinner and the Carrs each contend that there is no evidence to support

the jury's finding that Doc Cornutt was Wallace Skinner's agent in connection with the acquisition of Tract 51. We agree.

A principal is liable for the fraudulent acts and misrepresentations of his authorized agent, even though the principal had no knowledge of the fraud and did not consent to it, whether or not he derives a benefit from it. *Henderson v. San Antonio & M.G.R. Co.,* 17 Tex. 560 (1856); *Wright v. Calhoun,* 19 Tex. 412 (1857); *Wink v. Wink,* 169 S.W.2d 721 (Tex.Civ.App.—Galveston 1943, no writ); *Gibson v. Associate Inv. Co.,* 198 S.W.2d 123 (Tex.Civ.App.—Austin 1946, no writ); 26 Tex.Jur.2d *Fraud and Deceit* § 75 (1961); *but see Pasadena Associates v. Connor,* 460 S.W.2d 473 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (principal liable for misrepresentations of agent only if misrepresentations are authorized or within scope of agent's authority). For there to be an agency relationship, there must be some act constituting an appointment of a person as an agent; it is a consensual relationship. *Lawler v. Federal Deposit Insurance Corp.,* 538 S.W.2d 245 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.). There must be a meeting of the minds as between the parties in establishing an agency relationship, and consent of both principal and agent is necessary to create the agency, although such consent may be implied rather than express; the intention of the parties must find expression either in words or conduct between them. *A & S Electrical Contractors, Inc. v. Fischer,* 622 S.W.2d 601, 603 (Tex.Civ.App.—Tyler 1981, no writ); *Texas Processed Plastics, Inc. v. Gray Enterprises, Inc.,* 592 S.W.2d 412, 416 (Tex.Civ.App.—Tyler 1979, no writ). In the absence of any claim or exercise of control by one party over the activities of another, there can be no agency relationship. *Texas Processed Plastics,* 592 S.W.2d at 416.

The evidence concerning the relationship between Skinner and Cornutt indicates that both served on the board of the Flood Control District. Cornutt was the District's treasurer, and oversaw the acquisition of property for the reclamation project. Wallace Skinner was a local landowner and

served as a figurehead president of the District as well. In early 1976, Cornutt approached Skinner about acquiring part of his tract for use by the District; Skinner objected on the basis of having already given up too much land. In August 1976, a month before Ward Hunt had agreed to sell Tract 51 to the District, Cornutt again approached Skinner and informed him that he was attempting to acquire Tract 51 for central sump storage. Skinner made no comment. Cornutt then suggested to Skinner that the District would be willing to swap Tract 51 for the property which he jointly owned with the Carrs. Cornutt testified that Skinner's only response to this proposal was "you've not bought the tract yet." In November 1976, Skinner signed a letter to the Flood Control District in which he indicated his willingness and that of the Carrs to trade Tract 52 for Tract 51. However, the jury expressly found that Skinner and the Carrs were co-tenants and were not partners. On September 2, 1976, Ward Hunt and Doc Cornutt agreed to terms on the sale of Tract 51. Ward Hunt testified that, throughout their dealings, he believed that Cornutt represented the District and not anyone else.

■ The evidence adduced at trial suggests only that Skinner was aware of Cornutt's attempts to purchase Tract 51. It does not show that Skinner and Cornutt intended to create an agency relationship, or that Skinner ever gave Cornutt any objections concerning Cornutt's activities with regard to the acquisition of Tract 51. Thus, we hold that there is no evidence that Doc Cornutt was acting as Skinner's agent in the purchase of Tract 51 from the Hunts. Our holding on this issue, by breaking the chain of agency found by the jury, relieves both Skinner and the Carrs of liability for Cornutt's actions under an agency theory.

STATUTORY FRAUD: Section 24.02

The Hunts, relying on a common law theory of fraudulent conveyances and subsequent bona fide purchasers, see, e.g. Carter v. Converse, 550 S.W.2d 322, 329 (Tex. Civ.App.—Tyler 1977, writ ref'd n.r.e.), contend that Skinner and the Carrs are not bona fide purchasers of the property, and that the conveyance to them is void. We disagree. This matter is controlled by Tex. Bus. & Com.Code Ann. § 24.02 (Vernon 1968). It provides:

(a) A transfer of real ... property is void with respect to a ... purchaser ... if the transfer ... was intended to

(2) defraud any ... interested person of that to which he is ... entitled.

(b) The title of the purchaser for value is not void under subsection (a) of this section unless he purchased with notice of

(1) the intent of his transferor to ... defraud; or

(2) the fraud that voided the title of his transferor.

■ The plaintiff has the burden of proving that a purchaser for value had the requisite notice of fraud. *Rucker v. Steelman*, 619 S.W.2d 5 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.); *Ellis v. Ureste*, 159 S.W.2d 226 (Tex.Civ.App.—San Antonio 1942, writ ref'd). The Hunts obtained jury findings which simply stated that neither Wallace Skinner nor the Carrs were bona fide purchasers, although the appellants do not complain of the form of the issue submitted on appeal. The jury also made an additional, if repetitive, finding that Skinner knew or should have known of the statements made by Doc Cornutt to Ward Hunt.

■ The appellants now contend that there is no evidence on which to support these findings. We agree. As we have indicated above, the evidence adduced at trial showed only that Skinner knew that Cornutt was attempting to acquire Tract 51. There is a complete lack of evidence, either direct or circumstantial, to indicate that he should have known exactly what Cornutt had told Ward Hunt or that he should have known of facts which would put him on further inquiry as to possible claims the Hunts would have against Cornutt and the Flood Control District. The Carrs, who had absolutely no contact with either Doc Cornutt or the Hunts, were ap-

parently attributed with Skinners' knowledge or notice. Since we have found no evidence to support a finding that Skinner had notice of a fraud (and so was not a bona fide purchaser), we are also compelled to hold that there is no evidence to support a similar finding as to the Carrs. Appellants' points of error on this issue are sustained.

### STATUTORY FRAUD: *Section 27.01*

The third theory under which the Hunts sought to hold only the appellant Skinner liable relies on the real estate fraud statute. Tex.Bus. & Com.Code Ann. § 27.01 (Vernon 1968). The relevant portions of this statute read:

> (a) Fraud in a transaction involving real estate ... consists of a ...
>> (2) false promise to do an act, when the false promise is
>>> (A) material;
>>> (B) made with the intention of not fulfilling it;
>>> (C) made to a person for the purpose of inducing that person to enter into a contract; and
>>> (D) relied on by that person in entering into that contract.
> (b) A person who makes a ... false promise, *and a person who benefits from that ... false promise,* commit the fraud described in Subsection (a) of this section and are jointly and severally liable to the person defrauded for actual damages....
> (c) A person who willfully makes a ... false promise, *and a person who knowingly benefits from a ... false promise,* commit the fraud described in Subsection (a) of this section and are liable to the person defrauded for exemplary damages not to exceed twice the amount of actual damages. (All emphasis is added).

The Hunts obtained jury findings which indicated both that Wallace Skinner benefited from Cornutt's statements to Ward Hunt and that he knowingly benefited from those statements. These findings would, apparently, make Skinner liable for damages under a literal reading of Section 27.-01, although the Hunts rely on the statute to support their claim for recission. We decline to accept the Hunts' interpretation of the statute.

■ Appellant Skinner attacks the relevant jury findings for the reason that there is no evidence in the record to support them. On the basis of our earlier findings, we are compelled to agree that there is no evidence that Skinner *knowingly benefited* from the fraud of another. Therefore, that point of error is sustained. We are unable to come to the same conclusion regarding the jury's finding that Skinner did in fact benefit from Cornutt's actions. In its plainest sense, Skinner did benefit from Cornutt's acquisition of Tract 51, assuming that the acquisition was fraudulent, because that is what made it possible for Skinner and the Carrs to obtain the conveyance from Carter, Trustee. However, we find it anomalous that the statute could be read to require proof of scienter on the part of the person making the fraudulent statements, while allowing recovery against a subsequent beneficiary who is completely lacking of a culpable mental state. *Cf. American Title Insurance Company v. Byrd,* 384 S.W.2d 683 (Tex.1964) (predecessor statute would not be extended to ancillary party).

■ The parties have not presented us with authority for the proposition that Section 27.01 renders a bona fide purchaser liable for the fraud of his seller, and our research has not produced any. Section 24.02 of the Business and Commerce Code, on the other hand, clearly states that the title of a purchaser of real estate for value and without notice of fraud is not voidable. Thus, a conflict would exist between these two provisions of the Business and Commerce Code if Section 27.01(b) is read to allow recission against bona fide purchasers of real estate. A statute will not be given a meaning inconsistent with other provisions if it is possible to harmonize them. *Barr v. Bernhard,* 562 S.W.2d 844 (Tex.1978); *Dallas Ry. & Terminal Co. v. Strickland Transp. Co.,* 225 S.W.2d 901 (Tex.Civ.App.—Amarillo 1949, no writ).

If there is a conflict between a general statute and a specific statute dealing with the same subject, the more specific provision controls. *State ex rel. Watkins v. Morgan,* 555 S.W.2d 217 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.); *GMC Superior Trucks, Inc. v. Irving Bank & Trust Co.,* 463 S.W.2d 274 (Tex.Civ.App.—Waco 1971); *Southwestern Gas & Elec. Co. v. State,* 190 S.W.2d 132 (Tex.Civ.App.—Austin 1945) *affirmed,* 145 Tex. 24, 193 S.W.2d 675 (1946); *City of Austin v. Cahill,* 99 Tex. 172, 88 S.W. 542 (1905). We find that Section 24.-02, which deals explicitly with the case of a subsequent bona fide purchaser of real estate, is more specific than Section 27.01(b)'s provision regarding "beneficiaries," and hold that it is controlling in the present case. To harmonize the two provisions, we further hold that Section 27.01(b) of the Business and Commerce Code does not apply to subsequent bona fide purchasers for value and without notice. Thus, that statute does not provide a theory upon which the Hunts can recover against Wallace Skinner.

### CONSPIRACY

The final theory on which the Hunts sought to recover from Wallace Skinner is that Cornutt and Skinner conspired to defraud them of their property. The jury found that Cornutt and Skinner did engage in such a conspiracy, but that the Carrs did not participate. Skinner contends that there is no evidence to support the finding that he did participate in a conspiracy, and we agree.

Generally, a civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Schlumberger Well Surveying Corporation v. Nortex Oil and Gas Corporation,* 435 S.W.2d 854 (Tex.1968). A "conspiracy to defraud" requires that the participants have a common purpose supported by concerted action to defraud, that each has the intent to do it, and that it is common to each of them and each has the understanding that the other has that purpose.

*Schlumberger Well Surveying Corp.,* 435 S.W.2d at 857.

Proof of conspiracy may be, and usually must be made by circumstantial evidence, but vital facts may not be proved by unreasonable inferences or by inferences piled on inferences. *Schlumberger Well Surveying Corp.,* 435 S.W.2d at 858. The evidence must do more than raise a suspicion. *Guynn v. Corpus Christi Bank & Trust,* 589 S.W.2d 764 (Tex.Civ.App.—Corpus Christi, 1979, writ dism'd). The evidence establishes only that Cornutt approached Skinner, informed him of his attempts to acquire Tract 51, and proposed that Skinner trade his property for Tract 51. There being no evidence that Skinner knew of Cornutt's statements to Ward Hunt, it would be unreasonable to indulge the further inference that Skinner had adopted a common purpose or intent to defraud the Hunts. Appellant Skinner's point of error is sustained.

Because there is no evidence to support findings vital to each theory of recovery, the case is reversed and judgment is rendered that the Hunts take nothing from the appellants Wallace Skinner, James E. Carr, and F. William Carr. It is unnecessary to address appellant's other remaining points of error. We now address the appellee's three conditional cross points.

### APPELLEE'S CROSS POINTS

In their first conditional cross point, the Hunts contend that the trial court erred in granting judgment N.O.V. for the Flood Control District and Cornutt, if based upon the doctrine of sovereign immunity, because such immunity does not apply to the District or to Cornutt, an officer and employee of Woodbine Development Corporation and Hunt Investment Corporation. In their second cross point, they contend that the trial court erred in rendering summary judgment in favor of Woodbine Development Corporation and Hunt Investment Company because there existed genuine issues of material fact regarding their role in the acquisition of Tract 51. In their third cross point, the Hunts contend that the trial

court erred in granting a directed verdict in favor of Phy and Carter because there were disputed fact issues as to their roles in the acquisition of Tract 51.

These cross points are not properly before this court. An appellee may not assign cross points against a co-appellee unless he perfects his own appeal. *Sherman v. Stein,* 173 S.W.2d 732 (Tex.Civ.App.—San Antonio 1943, writ ref'd); *Maryland Casualty Co. v. Willig,* 10 S.W.2d 415 (Tex.Civ. App.—Waco, 1928, writ ref'd). As no bond was filed by the Hunts, no appeal has been perfected by them against parties to the suit who are not parties to this appeal. Appellees' conditional cross points are overruled.

Reversed and rendered.