**ATLANTIC RICHFIELD COMPANY, Chemlink Inc., Richard Quinn, and S.M. Murphy, Appellants,**

**v.**

**MISTY PRODUCTS, INC., d/b/a MPI Products, and Misty Rucker, Appellees.**

**No. C14–90–00741–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 19, 1991.

Rehearing Denied Jan. 23, 1992.

Thomas G. Greene, III, Linda Broocks, Houston, for appellants.

Michael Y. Saunders, Carl D. Kulhanek, Jr., Houston, for appellees.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

## MAJORITY OPINION

ROBERTSON, Justice.

This is an appeal from a judgment in favor of Misty Products, Inc., d/b/a MPI Products ("MPI"), and Misty Rucker based on jury findings of false representations, conspiracy, and misappropriation of trade

secrets. The jury awarded appellees $1,030,000.00 in actual damages and a total of $890,000.00 in punitive damages. Appellants bring eighteen points of error, primarily complaining of insufficient evidence to support the jury's findings of liability and damages. We reverse.

On an annual contract basis, MPI supplied Atlantic Richfield Company ("ARCO") with industrial cleaners and related equipment from 1980–84. In the summer of 1984, Misty Rucker, owner of MPI, had discussions with Frank Sullivan, a regional manager for ARCO, Chemlink Division, regarding the possible sale of MPI to Chemlink. Sullivan had previously heard from a Chemlink Sales Manager in Beaumont that ARCO should consider entering the industrial soap market. Sullivan contacted Richard Quinn, Marketing and Planning Manager of Chemlink in Philadelphia, regarding Chemlink's interest in acquiring MPI. Quinn testified that he requested and received general product information from MPI. Rucker testified, however, that Quinn requested and received confidential financial data. Chemlink subsequently advised Rucker that they were not interested in acquiring MPI.

The ARCO Purchasing Manager, Steve Murphy, became concerned about the increasing cost of industrial cleaners in 1984. Although there were no complaints about the MPI product's quality, an investigation revealed that increased quantities of the product were being used. Murphy spoke to James Waterfallen, Chemlink Area Manager who in turn spoke to the Chemlink product development division about the possibility of developing an industrial cleaner.

In Fall 1984, Chemlink decided to bid on the ARCO industrial cleaner contract. Chemlink's chemists bought an industrial cleaner concentrate (Stepan) and diluted it with water. This cleaner, named IPC 5180, was the product Chemlink submitted in its bid in December 1984. Because the Stepan product contained a hazardous chemical, Chemlink ultimately supplied ARCO with another product containing the concentrate Witco 45DS.

ARCO conducted a test of all products involved in the bidding. The tests revealed that the MPI, Chemlink, and Oakite products performed satisfactorily. The Oakite product performed best, but was more expensive than the others. Although the Chemlink product cost more per gallon than the MPI product, Chemlink included an activity percentage that showed its product to be more cost effective than MPI's product. ARCO ultimately chose to award the contract to Chemlink. Chemlink's product did not have a material safety data sheet (MSDS), which ARCO required in the bids, but an MSDS was supplied before the product was delivered to the plant.

The ARCO contract was 50–60% of MPI's total business and the loss of this contract resulted in a loss of approximately $300,000.00 in annual gross sales. Rucker and her employees took pay cuts and attempted to recover the ARCO business in 1986. In the ARCO tests for the 1986 contract bids, Chemlink's product received the poorest performance rating. The Maintech product had the best performance and price and was awarded the 1986 ARCO contract. The loss of the ARCO business ultimately caused Rucker to file bankruptcy.

MPI filed suit in 1988 against appellants alleging breach of contract, unfair competition, tortious interference with contract and with business relations, misappropriation of trade secrets, conspiracy, misrepresentation (fraud), conversion, quantum meruit, and negligent and intentional infliction of emotional distress. The case was tried to a jury. The judgment indicates that the trial court granted appellants' motion for instructed verdict on all claims other than fraud, conspiracy, and misappropriation of trade secrets. On the claims submitted, the jury found: (1) misappropriation of MPI's trade secrets by ARCO, Chemlink, and Steve Murphy, as an employee or agent of ARCO; (2) civil conspiracy to deprive MPI of business by Chemlink, ARCO, and Murphy as employee of ARCO, and by Richard Quinn as employee of Chemlink; and (3) misrepresentation by Chemlink, ARCO, and Murphy as employee of ARCO.

In points of error three through seven, appellants challenge the jury's findings of false representations. In point of error six, appellants contend no evidence supports the jury's finding that Murphy made a false representation. In points of error four, five, and seven, appellants claim insufficient evidence supports the jury's findings that Chemlink, ARCO, and Murphy made false representations.

In reviewing a no evidence point, we may consider only the evidence and inferences tending to support the jury's finding, disregarding all evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex. 1990). If any evidence of probative force supports the finding, the point must be overruled. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). If, on the other hand, the evidence is so weak as to create mere surmise or suspicion of the existence of a fact, the evidence is no more than a scintilla and is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

Where a party alleges factually insufficient evidence to support a finding, the court must review all of the evidence. *Plas-Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The reviewing court may set aside the finding only if the evidence is too weak to support the finding or if the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *See Wilson v. Goodyear Tire & Rubber Co.*, 753 S.W.2d 442, 448 (Tex.App.—Texarkana 1988, writ denied).

In their petition, appellees pled misrepresentation and fraud, alleging that appellants misrepresented facts with the intent of inducing appellees to disclose confidential MPI product and equipment data and to submit a bid with sealed trade secrets when ARCO was engaged in preferential bidding practices. The elements of actionable fraud are: "(1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a posi-

tive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983) (quoting *Wilson v. Jones*, 45 S.W.2d 572, 574 (Tex. Comm.App.1932, holding approved)). Given an instruction closely resembling the above definition of fraud, the jury found that Chemlink, ARCO, and Murphy, acting in the course and scope of his employment for and as an agent of ARCO, committed fraud.

We find insufficient evidence to support a finding that ARCO or Chemlink made false representations to MPI with the intent to induce MPI to disclose confidential data or to submit a bid with sealed trade secrets. Appellees contend ARCO's feigned interest in acquiring MPI came through the Chemlink chain of command and induced Misty Rucker to disclose considerable confidential MPI information. To constitute a false representation, the evidence would have to show that ARCO and Chemlink falsely represented ARCO's interest in acquiring MPI.

The record indicates that Frank Sullivan, an area manager for Chemlink, discussed with Misty Rucker Chemlink's possible interest in acquiring MPI. This discussion occurred in the summer of 1984. Sullivan contacted Quinn, Marketing and Planning Manager for Chemlink in Philadelphia, to determine whether Chemlink was interested in MPI as a possible acquisition. Quinn testified that he requested only general product information from Rucker. Although the letter from Rucker to Quinn indicates that it transmits "various product data and equipment information," Rucker testified that she also sent Quinn confidential financial information. Quinn further testified that he gave the general product data to Bill Britton, another Chemlink manager in Philadelphia who was in charge of the industrial cleaner area. Quinn testified that he concluded from his own review of the material that Chemlink would not be interested in acquiring MPI and that Britton reached the same conclusion. Chem-

link subsequently advised Rucker that they were not interested in pursuing acquisition discussions.

This evidence shows that Quinn and Sullivan, acting as employees of Chemlink, made representations to Rucker that ARCO might be interested in acquiring MPI. Appellees contend that the jury could infer these representations were false because they induced MPI to divulge confidential information which she would not have done had she known that Chemlink was preparing to bid against her for the ARCO contract. To raise a reasonable inference that Chemlink feigned an interest in MPI to gain access to MPI's confidential financial data, there must be some evidence of Chemlink's access to this data, such as using it to gain a competitive advantage in the bid process. Rucker testified that Chemlink reviewed MPI's books, financial statements, and assets. The record contains no evidence indicating that Chemlink used any confidential MPI data. In fact, the record shows that Chemlink submitted a bid using a different product than MPI, charging a higher price per gallon than MPI, and, unlike MPI, including a per gallon delivery charge.

To conclude that Chemlink made false representations, the jury must have inferred that Chemlink's interest in acquiring MPI was false based on an inference that Chemlink accessed and used MPI's financial data to gain a competitive advantage. The piling of inference upon inference is impermissible. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968); *Carr v. Hunt*, 651 S.W.2d 875, 882 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The evidence must do more than raise suspicion. *Carr*, 651 S.W.2d at 882. Thus, we find insufficient evidence to support the jury's finding that Chemlink made false representations about its interest in acquiring MPI.

■ Appellees suggest the jury could have inferred that, even if Quinn and Sullivan did not know their representations to Rucker were false, others in the Chemlink organization made the false representations to Rucker through Quinn and Sullivan

to obtain the confidential information. If evidence tended to show that Chemlink employees made representations about Chemlink's interest in acquiring MPI to Quinn and Sullivan with the intent that Quinn and Sullivan communicate this representation to Rucker, such evidence would support the jury's finding against Chemlink. A person indirectly makes false representations by making the representation to another with the intent that it be repeated to the intended party for the purpose of deceiving him. *Neuhaus v. Kain*, 557 S.W.2d 125, 138 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). Our review of the evidence, however, reveals no evidence that other Chemlink employees made false representations to Quinn and Sullivan regarding the acquisition of MPI. Thus, only speculation would support an inference that Chemlink indirectly made false representations to Rucker.

We further find no evidence that Murphy made any false representations to MPI with the intent to induce MPI to disclose confidential data or to submit a bid with sealed trade secrets. Appellees claim that Murphy approved the Chemlink acquisition of MPI in June 1984 and discussed the possibility of Chemlink bidding on the ARCO contract in July 1984. If these alleged facts were supported by the record, then we might agree with appellees that the jury could infer Murphy was encouraging acquisition negotiations while soliciting Chemlink's bid on the business that made MPI valuable. Our review of the record, however, indicates that appellees' version of these facts is inaccurate.

■ In addition to the false representations alleged in the petition, appellees claim other false representations were raised and supported by the evidence. If the evidence raises an issue and the opposing party fails to raise the lack of pleading before submission to the jury, the issue is tried by implied consent as if it were raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991).

Appellees claim that the rules in the bid invitation were a continuing representation that MPI's formula would remain sealed

until a question about the product arose. Appellees claim ample evidence showed that no such question ever arose, and thus, the jury could conclude that Murphy opened the formula with malicious intent to share the formula with Chemlink. While we understand appellees' theory, the evidence does not support it.

The evidence shows that Murphy became the Purchasing Manager for the ARCO refinery on July 1, 1984. Murphy testified to concerns about increases in usage of the MPI product. Murphy told James Waterfallen, Chemlink Area Manager, to investigate the industrial cleaning costs. Murphy testified that he had a conversation in September 1984 with Archer Allan Muse, Jr., the plant manager about the increase in usage of MPI soap. Murphy testified that Muse asked if there were a way to determine whether the MPI product had changed. Murphy told Muse that he could check the sealed formula in the files. Murphy sent the formula to other personnel at Chemlink to determine the make-up of the product, but no one was able to understand the formula. Murphy testified that he did not discuss the formula with any Chemlink employee and that he asked the personnel attempting to analyze the formula not to discuss the formula with anyone. Murphy further testified that Chemlink began to consider bidding on the ARCO contract in October–November 1984.

Murphy also discussed with Waterfallen the possibility of Chemlink bidding on the ARCO soap contract. Waterfallen asked the Chemlink chemists to develop an industrial cleaner. Murphy told Misty Rucker that Chemlink would bid on the ARCO contract. In early 1985, after Chemlink had been awarded the contract, Rucker called Murphy and asked for the MPI formulas submitted with the prior bids. When she received them, she found that one envelope had been opened, even though the envelope stated *"CONFIDENTIAL FORMULATION* NOT TO BE OPENED OR USED UNLESS PURCHASING MANGER [sic] APPROVES."* The ARCO bid invitation stated that all bidders were required to furnish exact formulations of the soap submitted. This document further stated:

This formulation will be sealed and will remain sealed until the contract is awarded. Formulations belonging to unsuccessful bidders will be returned to them, still sealed, at that time. Arco Purchasing will retain the sealed formulation of the successful bidder in case a question should ever arise concerning material being furnished.

Although the record shows that Murphy opened a sealed envelope containing MPI's formula, no evidence shows that anyone deciphered the MPI formula or that Murphy shared the formula with anyone at Chemlink. Even if evidence did show that Chemlink had access to the MPI formula, no evidence shows that Chemlink used this formula. The record shows that Chemlink submitted in its bid a soap product consisting of a diluted product from Stepan and that Chemlink ultimately supplied ARCO with a diluted product from Witco. Thus, the evidence shows that Chemlink purchased commercially available soap concentrates and diluted them with water.

■ Finally, appellees suggest that, based on the testimony about the tests of the Chemlink soap submitted for the 1985 and 1986 bids, the jury could have found that ARCO or Murphy knew that Chemlink used MPI's product for the 1985 test. Appellees do not explain how this constitutes a false representation that induced MPI to bid on the contract or to do anything MPI would otherwise not have done. As we mentioned earlier, a speaker is liable for fraud if he makes a false representation with the intention that the other party act in reliance upon the representation and if the other party thereby suffers injury. *Trenholm,* 646 S.W.2d at 930.

Raymond Allen Stephenson, a corrosion engineer for ARCO, testified that he was involved in the testing of cleaners for the bids for the ARCO 1986 contract. Stephenson had representatives from the bidding companies bring a sample of their product and demonstrate its cleaning ability. According to documentation from the test for the 1986 contract bids, the Chemlink product performed poorly and left the surface

oily. This documentation shows that the MPI product performed well, demonstrating "good heavy and light oil removal...."

Darrell Sutherland, a former corrosion engineer for ARCO, had performed the tests for the 1985 contract bids in January or February 1985. Sutherland testified that he recalled the performance of the Chemlink and MPI products as very close in effectiveness. These test results, therefore, conflict with the test results in 1986. Sutherland reported the results of his tests to Murphy, but he did not recall what he told Murphy. Misty Rucker testified to the following statements by Bill Stevenson, who cleaned coker units at the ARCO refinery:

Q. He told you that Chemlink was using your product to test to get the bid?
A. No. I asked him how Chemlink's product worked when he tested it in 1984. He said, "Just fine. It is your product."

We agree with appellees that, if the jury believed this testimony, the jury could have found that Chemlink used MPI's product in the tests for the 1985 contract bid. This was not, however, the question submitted to the jury. The jury question asked whether ARCO or Chemlink made false representations to MPI "inducing [MPI] to rely on such false representation to the detriment of [MPI]." In answering this question, the jury was instructed they had to find the false representation was "made for the purpose of inducing [MPI] to do something which they otherwise would not have done...." No evidence shows that ARCO or Chemlink made any representations, with awareness of their falsity, that induced MPI to do something it otherwise would not have done.

Aside from finding no evidence that MPI relied on any representations, we find no evidence that Murphy was involved in the 1985 testing or was aware that MPI's product may have been used. Having found no evidence supporting the jury's finding of false representations by Murphy, and insufficient evidence supporting the findings of false representations by ARCO and Chemlink, we sustain points of error four, five, and six. We need not address point of error seven challenging the factual sufficiency of the evidence supporting the finding that Murphy made a false representation.

In point of error three, appellants claim there is a fatal conflict in the jury's finding that Chemlink made a false representation but that neither Quinn nor Sullivan made a false representation. Asserting that a corporation can act only through its agents and that Quinn and Sullivan are the only Chemlink agents who made representations to MPI, appellants reason that Chemlink cannot be liable for fraud unless one or both of these agents were liable for fraud. Because we have found insufficient evidence to support the jury's finding that Chemlink made false representations, we need not address this point.

■ In point of error eight, appellants claim the trial court erred in rendering judgment in favor of MPI and in denying appellants' motion for judgment notwithstanding the verdict because as a matter of law ARCO and Chemlink cannot conspire with each other. The evidence showed that, during the time in question, Chemlink was a wholly owned subsidiary of ARCO. As a matter of law, a parent corporation cannot conspire with its fully owned subsidiary. *Copperweld Corp. v. Independence Tube Co.*, 467 U.S. 752, 777, 104 S.Ct. 2731, 2744–45, 81 L.Ed.2d 628 (1984); *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir.1985). A panel of this court, following precedent from the First Court of Appeals, extended this principle and held that an agent, acting within the scope of the agency relationship, cannot tortiously interfere with the business relations of the principal. *American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331 (Tex.App.—Houston [14th Dist.] 1991, n.w.h.) (opinion on reh'g) (citing *Baker v. Welch*, 735 S.W.2d 548, 550 (Tex.App.—Houston [1st Dist.] 1987, writ dism'd)). *See also Wilhite v. H.E. Butt Co.*, 812 S.W.2d 1, 5 (Tex.App.—Corpus Christi 1991, no writ) (holding that, as a matter of law, a corporation cannot conspire with it-

self, no matter how many agents of the corporation participate in the alleged conspiracy). We hold that, as a matter of law, Chemlink and ARCO could not conspire with each other and we sustain point eight. Based on this holding, we need not address points of error nine and ten challenging the sufficiency of the evidence supporting the jury's findings that Chemlink and ARCO conspired.

In points of error eleven and twelve, appellants contend that insufficient evidence supports the jury's findings that Quinn and Murphy entered into a civil conspiracy. The jury found that Murphy, "acting in the course and scope of his employment.for or as an agent of [ARCO]," entered into a civil conspiracy. The jury also found that Quinn, "acting in the course and scope of his employment for or as an agent of Chemlink, Inc.," entered into a civil conspiracy. Because we have held that a parent corporation and its wholly owned subsidiary cannot conspire, we further hold that an employee or agent of the parent corporation and an employee or agent of the wholly owned subsidiary, acting within the course and scope of their employment or agency relationship, cannot conspire. Thus, we need not address points eleven and twelve.

In point of error thirteen, appellants claim the trial court erred in overruling objections to the admissibility of Bill Stevenson's statement because it was inadmissible hearsay. Misty Rucker testified that an ARCO employee, Bill Stevenson, told her that Chemlink used MPI's product for the 1985 performance test. Appellants claim they timely objected to this statement as inadmissible hearsay. To preserve complaint on appeal regarding a trial court's ruling on the admissibility of evidence, a party must make a timely objection and obtain a ruling before the testimony is offered and received. *Zamora v. Romero,* 581 S.W.2d 742, 747 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). The party waives any complaint if an objection is made after admission of the evidence, *id.,* or if testimony to the same effect has been previously admitted without objection. *Badger v. Symon,* 661 S.W.2d 163, 164 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.).

Our review of this testimony reveals that appellants first objected to this alleged hearsay testimony on the ground that there was no predicate indicating whether Stevenson would have any knowledge about the Chemlink performance test. The trial court overruled this objection. After Rucker repeated this statement twice, appellants finally objected on the grounds of hearsay and no proper predicate. The trial court overruled these objections. Appellants did not object on the ground of hearsay until Rucker had made the statement three times. Appellants waived any complaint on appeal. We overrule point thirteen.

In points of error fourteen through sixteen, appellants challenge the sufficiency of the evidence to support the jury's findings that Murphy, ARCO, or Chemlink misappropriated or disclosed any of MPI's trade secrets. Appellants argue that the evidence does not establish commercial use, a required element of the tort of misappropriation of trade secrets. Appellees counter that ARCO and Chemlink benefitted from the use and disclosure of MPI's confidential financial, cost, sales, and customer data provided during acquisition discussions and from the use and disclosure of MPI's soap formula.

Where a party alleges factually insufficient evidence to support a finding, the court must review all of the evidence. *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). The reviewing court may set aside the finding only if the evidence is too weak to support the finding or if the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *See Goodyear Tire & Rubber Co.,* 753 S.W.2d 442, 448 (Tex.App.—Texarkana 1988, writ denied).

In *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958), *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) (opinion on reh'g), the court offered the following definition, which is es-

sentially the definition offered to the jury in this case:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Id.* 314 S.W.2d at 776 (quoting RESTATEMENT OF TORTS § 757 (1939)). Liability occurs if one discloses or uses another's trade secrets, without privilege to do so, if "(a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." *Huffines,* 314 S.W.2d at 769. Thus, actual use or disclosure of the trade secret is a required element of the tort. Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret. *See Metallurgical Indus. Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1205 (5th Cir.1986).

■ We may uphold the findings that Murphy, ARCO, and Chemlink misappropriated MPI's trade secrets only if the evidence shows they disclosed or used MPI's trade secrets to its competitive disadvantage. *See University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 542 (5th Cir.1974). Rucker testified that, during acquisition discussions, she sent Richard Quinn confidential financial data. Quinn testified that he requested and received only general product information and that he did not receive any detailed financial data from Rucker. Quinn further testified that he gave this information to Bill Britton for his opinion whether Chemlink should pursue acquisition negotiations. Britton and Quinn determined that Chemlink would not pursue acquisition of MPI. Even if the jury had believed Rucker's testimony, no evidence established that Quinn or Britton, the two individuals with access to this data, had any knowledge of or were in any way involved in Chemlink's decision

to develop a soap product and market it to ARCO.

As to MPI's formula, the evidence shows that Murphy opened a sealed envelope containing the formula and disclosed it to several Chemlink employees for analysis. Murphy testified that he advised these employees to maintain confidentiality. Uncontroverted testimony established that Chemlink's chemists were unable to decipher MPI's formula. Furthermore, the evidence showed that Chemlink's product consisted of a commercially available soap concentrate diluted with water. Upon review of all the evidence, we agree with appellants that insufficient evidence supports the jury's findings that Murphy, ARCO, and Chemlink misappropriated or disclosed any trade secrets of MPI. Thus, we sustain points of error fourteen through sixteen.

In points of error one and two, appellants challenge the sufficiency of the evidence supporting the jury's award of actual damages. In points of error seventeen and eighteen, appellants challenge the jury's findings regarding exemplary damages. Having sustained appellants' challenges to the jury findings of conspiracy and to the sufficiency of the evidence on the findings of false representation and misappropriation of trade secrets, we need not address the points of error regarding damages.

Because we have found that no evidence supports the jury's finding that Murphy made false representations and that, as a matter of law, we cannot uphold the findings of civil conspiracy, we reverse the trial court's judgment and render judgment in favor of ARCO Chemlink, Murphy and Quinn on these findings. Having found insufficient evidence supporting the jury's findings of false representations by ARCO and Chemlink and insufficient evidence supporting the jury's findings that Murphy, ARCO, and Chemlink misappropriated MPI's trade secrets, we reverse the trial court's judgment as to these findings and remand the cause for new trial on these issues.

SEARS, Justice, dissenting.

The majority opinion reverses the trial court's judgment based on a finding of no

evidence supporting the jury's findings of false representations and misappropriation of trade secrets, and that the jury's finding of conspiracy is precluded as a matter of law. Although I agree with the majority's holding regarding the conspiracy issue, I believe sufficient evidence supports the jury's findings of false representations and misappropriation of trade secrets. Having overturned all liability findings, the majority does not reach the points of error regarding damages. Because I would uphold two liability findings, I address the damages issues and would hold that insufficient evidence supports the award of actual damages. Therefore, I respectfully dissent.

In points of error four and five, appellants claim that insufficient evidence supports the jury's findings that ARCO and Chemlink made false representations to MPI. In points of error six and seven, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's finding that Steve Murphy, as an employee of ARCO, made false representations to MPI.

Where a party challenges the legal sufficiency of the evidence, a reviewing court may consider only the evidence tending to support the jury's finding, disregarding all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). The jury's finding must be upheld if any evidence of probative force supports it. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex. 1989).

When confronted with a challenge to the factual sufficiency of the evidence supporting a jury finding, the reviewing court must examine all the evidence. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986). After considering all of the evidence, the reviewing court may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Anthony Pools v. Charles & David, Inc.*, 797 S.W.2d 666, 676 (Tex.App. [14th Dist.]

1990, writ denied). Furthermore, if a court of appeals reverses on insufficiency grounds, *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) requires the court to specify the relevant evidence and state why it is factually insufficient. The court must also state why the contrary evidence greatly outweighs the evidence in support of the verdict. *Id.*

Finally, an appellate court may not substitute its judgment for that of the trier of fact, even if the appellate court, after reviewing the evidence, would have reached a different conclusion. *Walter Baxter Seed Co. v. Rivera*, 677 S.W.2d 241, 244 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.). It is within the sole province of the jury, as trier of fact, to judge the credibility of witnesses and the weight to be given their testimony. *Id.* An appellate court may not interfere with the jury's resolution of conflicts in the evidence or to pass upon the weight or credibility of the witness' testimony. *Id.*

Appellees pled fraud and misrepresentation by ARCO and Chemlink, and by their employees. The elements of fraud are:

(1) that a material representation was made;

(2) that it was false;

(3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by the party;

(5) that the party acted in reliance upon it; and

(6) that he thereby suffered injury.

*Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). Silence can constitute a false representation when the circumstances impose a duty to speak and the party deliberately remains silent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). Fraudulent intent may be proven by circumstantial evidence. *Id.* Circumstantial evidence can establish a fact when that fact is a fair and reasonable inference from other facts proven in the case. *Rivera*, 677

S.W.2d at 244. Bearing these rules in mind, I turn to the evidence.

MPI supplied ARCO with industrial soap and related equipment under annual contracts from 1980–84. In the summer of 1984, Chemlink, a subsidiary of ARCO, demonstrated its interest in entering the industrial soap area when it considered the acquisition of MPI. An employee of Chemlink met with Misty Rucker, the owner of MPI, and the two parties entered into a commission agreement in the event a sale of MPI to Chemlink occurred. Richard Quinn, the Chemlink manager of marketing and planning in Philadelphia testified that he requested and received general product information from MPI. Contrary to this testimony, Rucker testified that Quinn requested and received financial data, including confidential matter.

Although Chemlink subsequently decided not to purchase MPI, the evidence shows that during the same general time period, Chemlink was preparing to enter the industrial soap business. Although there were no complaints about the quality of MPI's soap, ARCO determined that its industrial soap costs were rising because of increases in the quantity of soap used. Steve Murphy, the ARCO purchasing manager, asked Chemlink to consider developing an industrial cleaner. Chemlink did develop a product and submitted a bid, competing with MPI, for the 1985 ARCO contract. Despite tests reflecting similar cleaning capabilities by the MPI and Chemlink soaps submitted, and higher quoted prices for the Chemlink soaps, ARCO awarded the 1985 contract to Chemlink.

Appellees contend the jury could infer from this evidence that Chemlink feigned an interest in acquiring MPI to induce MPI to divulge confidential information, and that Rucker would not have divulged this information had she known Chemlink was preparing to bid against MPI for the ARCO contract. By considering the acquisition of MPI, Chemlink demonstrated some interest in entering the industrial soap business. The jury may have believed Rucker's testimony that Chemlink sought and received confidential financial information from MPI

when they were considering acquiring it. If so, the evidence that Chemlink began preparing to bid against MPI for the ARCO contract almost immediately thereafter is sufficient to raise suspicion as to Chemlink's motives in reviewing the MPI data. The jury could have inferred from this evidence that Chemlink requested and received the MPI data to discover any information helpful in competing with MPI for the ARCO contract, and not because it was interested in acquiring MPI. Thus, these facts alone are sufficient to support a finding that Chemlink falsely represented an interest in acquiring MPI, intending that MPI rely and act upon this representation by divulging information. Other evidence, however, also supports the jury's finding of false representation.

The ARCO bid invitation stated that a successful bidder's formula would remain sealed unless a question arose about the product. Because MPI had been the successful bidder for several years, ARCO had files containing MPI's formula in sealed envelopes. According to Chemlink's purchasing manager, Steve Murphy, he discussed the increases in the quantity of MPI soap used in the ARCO plant with Archer Allan Muse, Jr., the plant manager, approximately one month before Chemlink began preparing to bid on the ARCO contract. Murphy testified that Muse asked if they could determine whether the MPI product had changed and that Murphy suggested they check the sealed MPI formula. Murphy also testified that he opened the sealed formula in Muse's presence. Muse, however, testified that he did not recall this conversation and denied being present when the sealed formula was opened. Although Murphy testified that he had the Chemlink chemists analyze the formula, Murphy maintained that he asked all personnel to keep the formula confidential and that the chemists were unable to decipher the formula.

The majority relies on the testimony that Chemlink could not decipher the formula and did not use this formula in its bid to conclude that, even if the formula was opened with fraudulent intent, no injury to MPI resulted from this action. The jury

did not, however, have to find that this was a separate false representation. The opening of the sealed formula is simply one more fact raising the inference that ARCO was engaging in deceptive conduct and may have attempted to assist its subsidiary in gaining an unfair advantage over MPI in bidding for the 1985 ARCO contract.

The evidence regarding the performance tests for the soaps submitted for the 1985 and 1986 bids further support the jury's finding of fraud. The jury heard testimony about conflicting results of the tests of soaps submitted in the 1985 and 1986 bids. The results from the 1985 performance test showed that the Chemlink and MPI soaps performed similarly and satisfactorily. The results from the 1986 performance test, in which MPI and Chemlink submitted the same soaps submitted in 1985, indicated major differences between the two soaps. While the MPI soap performed well, the Chemlink product performed poorly, producing large amounts of foam that failed to clean oily surfaces.

Misty Rucker's testimony offered a reason for these conflicting results. Rucker testified that she asked Bill Stevenson, apparently an ARCO employee, how Chemlink's soap performed in the test for the 1985 contract and Stevenson said, "Just fine. It is your product." Based on this testimony together with the evidence of the conflicting test results, the jury could have found that Chemlink used MPI's soap, falsely representing it to be Chemlink's, for the 1985 contract performance test. This evidence is also sufficient to support the jury's finding of false representations by ARCO, since at least one ARCO employee was aware of the deception. This evidence also supports a finding of false representations by Chemlink in using MPI's product while representing it as theirs.

The jury question asked whether ARCO or Chemlink made false representations inducing MPI to act on these representations to MPI's detriment. The instruction for this question explained that, to find liability, the jury had to find the false representation was "made for inducing [MPI] to do something which they otherwise would not

have done...." Despite the evidence indicating deception, the majority concludes there is no evidence of false representations because no evidence shows that the deceptive acts induced MPI to do anything it otherwise would not have done. I disagree with this conclusion.

Had Misty Rucker known that Chemlink was preparing to develop an industrial soap product and submit a competing bid for the ARCO contract, she most likely would not have sent MPI financial data to Richard Quinn. Although Rucker probably would have submitted a bid for the 1985 ARCO contract even if she had known that Murphy opened her sealed formula, she may have taken other actions to protect her trade secret. Although she was not induced to do anything she would not otherwise have done, she was induced not to take protective action by ARCO's representations that the formula would remain sealed. Similarly, Rucker was not induced to do anything she would not otherwise have done by Chemlink's actions during the performance test. By the time Chemlink allegedly used her product in the performance test, MPI had already submitted a bid. However, had she known at the time that Chemlink was using her product and that ARCO's procedure for testing products was lax enough to allow a bidder to engage in such deception, Rucker might have sought more reliable testing or taken additional steps to protect her company. Certainly, the evidence is sufficient to show that Murphy, ARCO, and Chemlink knowingly made false representations, either by positive assertions or by their silence, and that MPI relied on the representations and suffered injury by losing the ARCO contract. Accordingly, I would overrule points of error four through seven.

In points of error fourteen through sixteen, appellants claim the evidence is insufficient to support the jury's findings that Murphy, ARCO, or Chemlink misappropriated or disclosed any of MPI's trade secrets. The majority accepts appellants' contention that commercial use of the trade secret is a required element of the tort of misappropriation of trade secrets. Texas law holds that a party is liable for disclos-

ing or using the trade secret of another if "(a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769 (1958), *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958). This language indicates that liability may be based on either disclosure or use. Thus, I disagree with the majority's conclusion that commercial use of the trade secret is a requirement.

Furthermore, there is sufficient evidence that Steve Murphy disclosed MPI's soap formula. Murphy admitted he opened the sealed formula and shared it with Chemlink employees who attempted to decipher it. Although Murphy testified that the bidding rules provided for the opening of a formula if questions arose about a product, the jury could have disbelieved Murphy's explanation of why he opened the sealed formula. We may not substitute our judgment for that of the trier of fact, even if, after reviewing the evidence, we would have reached a different conclusion. *Rivera*, 677 S.W.2d at 244. Thus, I would overrule points fourteen and fifteen because sufficient evidence supports the jury's finding.

Since I would uphold the jury's findings of liability for false representations and misappropriation of trade secrets, I would also address the points of error regarding damages. In points of error one and two, appellants contend insufficient evidence supports the jury's award of $1,030,000.00 in actual damages. Alternatively, appellants claim there is insufficient evidence that MPI suffered more than $30,337.00, the 1984 profits stated on MPI's tax return, or $190,000.00, the amount of net profits in 1984 as calculated by MPI's expert witness. Appellants claim that (1) appellees' evidence of lost profits was insufficient because appellees' expert witness failed to deduct actual expenses from the gross receipts; (2) the evidence of lost profits for any year after 1985 was uncertain; (3) appellees' testimony as to the value of MPI's equipment was insufficient to establish market value; and (4) appellees' testimony that an unnamed lender refused to finance a purchase of equipment because the purchase was not for the ARCO contract was insufficient evidence of loss of credit.

To recover lost profits, a party must show the amount of the loss with reasonable certainty by competent evidence. *Lovelace v. Sabine Consolidated, Inc.*, 733 S.W.2d 648, 655 (Tex.App.—Houston [14th Dist.] 1987, writ denied). Uncertainty as to the fact of damages will defeat recovery. *Id.*

In their post-submission brief, appellants argue that the evidence and argument concerning conspiracy prejudicially influenced the jury in answering the damages issues. Appellants contend this influence is exemplified by the jury's punitive damages award of $30,000.00 against Richard Quinn, whom the jury found liable only for conspiracy. Furthermore, the jury assessed more punitive damages against Quinn and Chemlink (Quinn's employer) than it assessed against Murphy and ARCO (Murphy's employer). Appellants assert that this variance must have resulted from the conspiracy finding.

Rule 277 authorizes the submission of broad-form questions to the jury. The actual damages issue in this case is in broad form, asking the jury to assess damages if they had affirmatively answered any of the three liability issues. Because the issue was submitted subjunctively, the reviewing court cannot determine the amount of damages assessed for any particular liability finding. A trial court is not, however, required to submit an issue relating the various elements of damages to the underlying theories of recovery unless a party specifically objects to the issue on this basis. *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987). Appellants did not object to the issue on this basis and do not complain on appeal about submission of this issue. Although the punitive damages award indicates a heavier assessment against those parties found liable for conspiracy, a reviewing court may not presume that the liability finding of conspiracy similarly influenced the jury in awarding actual damages. Because I would uphold two of the three liability findings, the broad-form sub-

junctive submission of the actual damages issue requires upholding the jury's award if sufficient evidence supports it.

Misty Rucker testified that the ARCO contract constituted 50–60% of MPI's total business. After losing the ARCO contract for 1985, Rucker estimated that, in 1985, MPI had 45–50% of the profits received in 1984. By 1986, Rucker estimated that MPI received 50–55% of the profits received in 1984. MPI's accountant, James Thomas, testified that MPI's net profit from sales to ARCO in 1984 was $190,000.00. Thomas defined net profits as sales minus material, labor, and overhead costs. Thomas deducted material costs directly. To calculate labor and overhead costs, Thomas allocated costs attributable to the ARCO account based on a percentage of total sales to ARCO. Thomas deducted this percentage allocation from gross profits.

Rucker further testified to other losses. Rucker testified that the market value of the equipment sold to Chemlink was $170,000.00. Rucker explained that she was forced to sell this equipment to Chemlink for $57,000.00 because MPI had no use for the equipment without the ARCO contract. After losing the ARCO contract, Rucker further testified that she was unable to obtain financing for equipment for other jobs.

If the jury based their award of damages on this evidence alone, they could not have calculated a total of more than $1 million in actual damages. If the jury awarded lost profits of $190,000.00 for the years 1985–86, this results in a total of $380,000.00. The evidence supporting the jury's liability findings relates only to the bid process for the 1985 ARCO contract. Chemlink did not obtain the ARCO contract in 1986. Thus, I would agree with appellants that the evidence of damages after the 1985 contract year is uncertain and that the maximum amount of lost profits available is $190,000.00.

The value of the equipment sold to Chemlink, minus the amount paid by Chemlink, was $113,000.00. Adding this sum to the maximum amount of lost profits results in a maximum total of $303,000.00. Even if the jury included a sum for lost credit, no evidence supports an award of more than $700,000.00 for this loss.

The only other evidence regarding damage to MPI concerns loss of the value of the business. In November 1987, Rucker filed bankruptcy, which she attributed to the loss of income and loss of credit caused by the loss of the ARCO contract. As to the value of MPI, Rucker testified that, during acquisition discussions with Chemlink, she told Quinn it would take in excess of $1 million to purchase MPI.

Citing *Porras v. Craig,* 675 S.W.2d 503 (Tex.1984) and *Southwestern Bell Tel. Co. v. Wilson,* 768 S.W.2d 755 (Tex.App.—Corpus Christi 1988, writ denied), appellants contend Rucker's testimony is not competent evidence because it does not refer to market value. In *Porras,* the court explained that an owner of real property can testify to its market value. 675 S.W.2d at 504. The court added that this testimony must clearly refer to market value, rather than intrinsic or other value of the property. *Id.* at 505. To meet this requirement, the court suggested that counsel ask the witness if he is familiar with the market value of his property. *Id.*

The Corpus Christi court extended the *Porras* requirements to testimony about the value of businesses and personal property. *Wilson,* 768 S.W.2d at 762. In *Wilson,* the owner of two corporations testified that the value of one corporation prior to seizure was $400,000.00 and that its value at the time of trial was zero. *Id.* As to the other corporation, the owner testified to an unaccepted offer to purchase the corporation for $1,500,000.00. *Id.* The trial court awarded the owner $400,000.00 and $1,500,000.00 for the diminution of value in the stock of the two corporations. *Id.* Citing *Porras,* the appellate court found that the owner never testified to the *market* value of his property. *Id.* Furthermore, the appellate court held that unaccepted offers to purchase are not competent evidence of fair market value. *Id.* Thus, the court found the owner's testimony constituted no evidence of market value. *Id.*

I agree that *Porras* and *Wilson* are controlling in this case. Rucker's counsel failed to ask her if she was familiar with the market value of her company. Furthermore, her testimony that she told Quinn she would sell MPI for a sum in excess of $1 million is not evidence of market value. Rucker's testimony regarding the value of MPI is simply not competent evidence of market value. If this testimony constitutes no evidence of the value of MPI, the competent evidence regarding the amount of damage suffered by MPI indicates a maximum total of $303,000.00, rather than the $1,030,000.00 actually awarded by the jury. Thus, insufficient evidence supports the jury's award of actual damages and I would sustain points of error one and two.

Based on my review of the evidence, I would affirm the trial court's judgment insofar as it holds appellants liable for false representations and misappropriation of trade secrets. I agree with the majority that the finding of conspiracy is precluded as a matter of law. Thus, I would reverse and render judgment in favor of appellants as to conspiracy. Finally, insufficient evidence supports the jury's award of actual damages and I would reverse this part of the trial court's judgment and remand the cause for a new trial as to damages.