**BAYOU TERRACE INVESTMENT CORPORATION and Vernon Paul Lyles, Appellants,**

v.

**Jack W. LYLES and June Lyles, Appellees.**

No. 01–91–00969–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 7, 1994.

812

Kevin Dubose, James G. Kinzer, Michael Kovich, Houston, for appellants.

Kenneth E. Kvinta, Glen Nordt, Houston, for appellees.

Before HEDGES, DUGGAN and O'CONNOR, JJ.

## OPINION ON MOTION FOR REHEARING

HEDGES, Justice.

We withdraw our earlier opinion, we substitute the following opinion in its stead, and we overrule appellants' motion for rehearing.

A failed real estate transaction gave rise to this suit for fraud, conspiracy to defraud, and breach of contract. Defendants Bayou Terrace Investment Corporation (BTIC) and Vernon Paul Lyles (Paul Lyles) appeal a $1,060,000 judgment in favor of plaintiffs, Jack W. Lyles (Jack Lyles) and June Lyles. Defendants assign as error that (1) the evidence was legally and factually insufficient to support liability and damages, (2) there is no legal basis for the damages awarded in the judgment, and (3) the trial court erred in failing to grant a judgment notwithstanding the verdict or a new trial on their counterclaim for tortious interference with contract. We reverse and remand for an election of remedies, reduce the award to reflect that election, and affirm the judgment in all other respects.

BTIC is a real estate holding company founded by Paul Lyles and his brother, Gary Lyles. At all times relevant to this suit, Paul Lyles was president of BTIC. Jack Lyles, Paul Lyles' step-uncle, was vice-president of sales in 1979. June Lyles, who has also been known as Blanche Bond, was Jack Lyles's wife at the time of trial. She is his long-time companion and may have been his common-law wife at the time of the transaction at issue.[1] Lyles and Lyles Bonding Company, also owned by Paul Lyles and his brother, provided most of the cash flow to service BTIC's expenses and the mortgage loans on its properties.

In early June 1979, Jack Lyles and Paul Lyles entered into an agreement whereby Jack Lyles transferred his residence (the Chrystell property) to BTIC. Jack Lyles understood that the purpose of the transfer

---

1. While June Lyles is named as plaintiff-appellee, she received no monetary damages under the judgment and was only named to hold the Chrys-tell property as her homestead jointly with Jack Lyles.

was to bolster BTIC's balance sheet so that it could leverage it and make investments in real estate. Under the agreement, BTIC could borrow any sum of money it deemed necessary against the Chrystell property. From the proceeds of such loan, $10,000 would be paid to BTIC on behalf of Jack Lyles to give him a 24.5 percent interest in the net profits generated on the sale of 6104 Memorial; the existing indebtedness on Chrystell property was to be retired; and the surplus loan funds were to be placed in certificates of deposit subject to his discretion and signature. In addition, Jack Lyles understood that the Chrystell property would be deeded back to him free and clear of liens after the Memorial property was sold. On June 11, 1979, Paul Lyles presented Jack Lyles a written contract that purportedly reflected the agreement as Jack Lyles understood it. The June 11 agreement was not introduced at trial.

On June 13, 1979, Jack Lyles signed a general warranty deed, prepared by BTIC's attorney, conveying the Chrystell property to BTIC. The next day, June 14, 1979, Jack Lyles signed an agreement that Paul Lyles represented to be the same as the June 11 agreement except for certain "legal changes."

On August 11, 1979, the funds of a $50,000 mortgage loan on the Chrystell property were disbursed to BTIC. This loan was authorized by BTIC's board of directors. On July 16, 1981, Jack Lyles and Paul Lyles executed a promissory note increasing the indebtedness secured by the Chrystell property to $60,000. On October 27, 1982, BTIC placed a $23,600 second lien on the Chrystell property. Jack Lyles did not execute the promissory note and the deed of trust and security agreement for that loan.

On February 9, 1983, a third party buyer executed an earnest money contract on the Memorial property for a purchase price of $265,000. In June 1983, plaintiffs filed suit and applied for lis pendens on both the Memorial and Chrystell properties. The Memorial property sale subsequently fell through; in July 1983, the mortgage-holder foreclosed its lien and sold the property for about $150,000.

At the foreclosure date, the Memorial property was owned by Paul Lyles' brother and was pledged to the sheriff as collateral to cover bond forfeitures incurred by Lyles and Lyles Bonding Company. The property was subject to (1) a first mortgage lien for $155,000, and (2) $75,000 in bail bond forfeitures, which together with estimated closing costs, taxes, and other expenses, totaled $274,250. Mortgage liens on the Chrystell property totalled $83,600.

In points of error one and two, defendants assert that the trial court erred in overruling their motion for judgment notwithstanding the verdict because there is no evidence to support liability or monetary damages. In point of error four, defendants challenge the judgment on the grounds that the jury findings on liability and damages were against the great weight and preponderance of the evidence.

■ To evaluate a no evidence point of error, an appellate court must consider only the evidence and inferences tending to support the jury findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If there is any evidence of probative value to support the jury's finding, the no evidence point must overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951).

■ To review factual sufficiency, a court of appeals must examine, consider, and weigh all the evidence. It should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The jury has the right to pass on the credibility of a witness and accept or reject the testimony. *Jones v. City of Odessa,* 574 S.W.2d 850, 854 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.).

Defendants challenge three jury findings on the issue of liability: fraud in the induce-

**814**

ment, conspiracy to defraud, and breach of contract. The trial court did not specify any theory of recovery in the judgment. By matching the amounts awarded in the judgment to the jury verdict, it is clear that the judgment is based on recovery for (1) both fraud and conspiracy to defraud, or (2) both fraud and breach of contract.[2]

■ The trial court charged the jury on common-law fraud, the elements of which are:

(1) A material misrepresentation was made;

(2) the representation was false;

(3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) the speaker made the representation with the intent that it should be acted upon by the party;

(5) the party acted in reliance upon the representation; and

(6) the party thereby suffered injury.

*Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 723 (Tex.1990). Plaintiffs allege that defendants fraudulently induced Jack Lyles to enter into the contract by misrepresenting certain terms and by promising certain benefits that were not incorporated into the agreement.

■ Jack Lyles testified as follows: Paul Lyles said he needed at least $10,000 to purchase the Memorial property. He and Paul Lyles orally agreed to place Jack Lyles' home in BTIC's name to give BTIC more equity. BTIC would then obtain a loan to fund investments, "primarily" the purchase of the Memorial property. The Memorial property would be repaired and sold within 90 to 180 days. At that time, the Chrystell property would be returned to him free and clear of liens. Paul Lyles assured him that the surplus of the borrowed money was to be placed in a certificate of deposit to be used only on Jack Lyles' authorization. This oral agreement was apparently incorporated in the unsigned contract of June 11, 1979. Be-

cause the June 11 agreement was not introduced into the record, its contents depend entirely on the testimony of Jack Lyles.

On June 14, 1979, Paul Lyles presented Jack Lyles with a second agreement. Jack Lyles testified that Paul Lyles explained to him:

This is the same thing as the other document with a few legal changes lawyer's jargon.... We need this in here and this in here for corporate protection ... but the main things are still in here. Everything surplus to this agreement will be placed in a C.D. not to be used except by your discretion and your signature.

Relying on Paul Lyles' representation that the second agreement was the same as the first, Jack Lyles did not read the new agreement. A review of this contract would have revealed that certain "notwithstanding" clauses negated key terms of the original agreement as Jack Lyles understood them:

(1) that Jack Lyles would indemnify BTIC for payment of BTIC's own interest, and that BTIC could at its discretion offset any such amount against monies owed Jack Lyles;

(2) that BTIC was entitled to apply any amount it deemed necessary from the certificates of deposit to reduce the mortgage indebtedness should the mortgage lien note go into default;

(3) that if after application of the proceeds of the certificates of deposit, the mortgage lien note was still in default, BTIC could offset any amount due against Jack Lyles' investment in the Memorial property; and

(4) that if after any amount due was offset against the investment, the mortgage lien note was still in default, BTIC could sell the Chrystell property.

We find that the discrepancy between Jack Lyles' understanding of the agreement and the actual terms of the signed contract, together with the evidence in the record that Paul Lyles would intimidate and bully his family members into signing documents, is

**2.** The trial court also submitted the issue of breach of fiduciary duty. The jury found that BTIC breached its fiduciary duty to Jack Lyles,

but that he suffered no damages as a result. Plaintiffs did not complain of that finding in their cross-points.

some evidence to support the jury finding of fraud in the inducement. We further find that the jury finding is not against the great weight and preponderance of the evidence.

■ We next consider plaintiffs' conspiracy claim. A conspiracy to defraud involves:

(1) two or more persons,

(2) with a common purpose,

(3) who undertake a concerted action to defraud,

(4) when each person has the intent to defraud, and

(5) each person understands that the other conspirators share that common purpose.

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex.1968). Defendants contend that because Paul Lyles acted only in his capacity as chief executive officer of BTIC and not in his individual capacity, he cannot be found to have conspired with himself. Plaintiffs counter that Paul Lyles and BTIC were separate and distinct.

■ Generally, a corporation cannot conspire with its own management personnel or employees when they act within the scope of their employment or in an agency relationship. *Atlantic Richfield Co. v. Misty Products, Inc.*, 820 S.W.2d 414, 421 (Tex.App.— Houston [14th Dist.] 1991, writ denied); *Wilhite v. H.E. Butt Co.*, 812 S.W.2d 1, 5 (Tex. App.—Corpus Christi 1991, no writ). But this prinicple is inapplicable where there is evidence that the agent or employee is simultaneously involved with another company or entity with conflicting interests. *Fojtik v. First Nat'l Bank of Beeville*, 752 S.W.2d 669, 673 (Tex.App.—Corpus Christi 1988), *writ denied per curiam*, 775 S.W.2d 632 (Tex. 1989).

In addition to his position as chief executive officer of BTIC, Paul Lyles owned 50 percent of Lyles and Lyles Bonding Company. He had transferred property from BTIC to his co-owner/brother to secure a bonding license. Paul Lyles also had sold BTIC

property on Piping Rock Road and gave his wife half the proceeds. He was also a part-owner of 3–JW Corporation, another real estate holding company that owned property acquired from BTIC.[3]

■ Further, Paul Lyles considered himself separate from BTIC, testifying that BTIC is "not my company. It is a company that I own stock in." When Jack Lyles referred to BTIC and Paul Lyles as "one and the same," Paul Lyles' attorney objected to that characterization. Paul Lyles was never the sole stockholder of BTIC. He described his role in BTIC as doing "what the Board of Directors instruct me to do." The evidence shows: (1) that BTIC was not merely the alter ego of Paul Lyles, but that he and the company were distinct entities; and (2) that Paul Lyles on certain occasions acted in conflict with the interests of BTIC. It is therefore legally possible for Paul Lyles to conspire with BTIC to defraud Jack Lyles.

■ As evidence of BTIC's acts in conspiracy with Paul Lyles, plaintiffs point to Tom White's testimony that he was BTIC's lawyer and that he prepared the deed transferring the Chrystell property at Paul Lyles' direction. In addition, BTIC's corporate secretary attested by affidavit that the Board of Directors duly authorized the corporation to pledge the Chrystell property as security for a loan. We find that there is more than a scintilla of evidence that Paul Lyles and BTIC conspired to defraud Jack Lyles. Furthermore, this finding is not against the great weight and preponderance of the evidence.

■ In support of their breach of contract claim, plaintiffs assert that the agreement stated "the balance of the funds obtained in the loan with Jack Lyles' home as collateral should be placed in a C.D. and not mortgaged, pledged, or invested by BTIC except in accordance with written instructions of Jack Lyles." Paul Lyles testified that two C.D.'s were purchased, one for $10,-000 and one for $5,000, and that these C.D.'s

---

**3.** The record reflects that a 75 per cent interest in Number Two Terrace Drive was first sold to a friend of Paul Lyles and his brother in 1981 and that Paul Lyles retained 25 per cent in trust for BTIC. No deed was filed. When the property was sold in February 1982 for $750,000, the profits went to 3–JW.

were used to reduce the note on the Chrystell property when his brother Gary closed the bonding company, cutting off the cash flow to BTIC. Jack Lyles testified that he understood that one $15,000 C.D. was to be purchased, but he could only account for the purchase of a $10,000 C.D. Jack Lyles further testified that he never gave permission to cash in any C.D.'s. There is more than a scintilla of evidence to support a breach of the agreement. Furthermore, the jury finding to that effect is not against the great weight and preponderance of the evidence.

We overrule point of error one and those portions of point of error four challenging the jury findings on liability as against the great weight and preponderance of the evidence.

■ In point of error two, defendants assert there is no evidence to support actual monetary damages of $460,000 against Paul Lyles and $100,000 against BTIC. Defendants' argument centers on the actual damages pleaded in plaintiffs' first amended original petition. They argue that at best, plaintiffs prayed for monetary damages only as an alternative to the return of the Chrystell property. Any monetary award should therefore be limited to the value of that property. Defendants further claim that any award of damages is "impermissibly speculative" without direct testimony of the Chrystell property's value. Admitting that they failed to prove the market value of the property, plaintiffs counter that the Chrystell property is worth at least $83,600, the total of the encumbrances on the property. Plaintiffs also argue that they also pleaded for other actual damages, including (1) the amount of the liens encumbering the property, (2) interest accrued, (3) prejudgment interest, (4) attorneys' fees. But, prejudgment interest, attorneys' fees, and punitive damages are incidental damages, not actual damages. Plaintiffs sought only actual damages in their pleadings.

We sustain point of error two with regard to the amounts awarded.

We previously found that the jury's findings on liability are not against the great weight and preponderance of the evidence and our disposition here of point of error two disposes of point of error four on the damage

issues. Therefore we overrule the remainder of point of error four.

In point of error three, defendants argue that even if there is evidence to support liability and damages, the judgment must be reformed. They argue that the judgment is defective because (1) it combines inconsistent remedies, (2) it allows double recovery, (3) it exceeds the scope of pleadings, and (4) is based on an inadequate jury finding.

Defendants assert that the judgment awards plaintiffs two mutually exclusive remedies under the fraudulent inducement claim: (1) restoration of full property rights, and (2) monetary damages as though the property were unrecovered. Relying on *Uvalde Construction Co. v. Joiner*, 132 Tex. 593, 126 S.W.2d 22, 24 (Tex.1939), defendants contend that plaintiffs were required to elect one or the other remedy.

Plaintiffs admit that they prayed for damages in the alternative "in the amount of the Chrystell property or that their property be restored to them." They attempt to avoid election of remedies by distinguishing *Uvalde Construction*, in which the cross-plaintiff did not seek rescission of the contract. They present a distinction without a difference.

In *Uvalde Construction*, the cross-plaintiff sought to recover $1,500 allegedly due under an oral employment contract that was executed contemporaneously with a mechanic's lien contract that was the subject of the main suit. Some of the allegations in the cross-petition suggested that the cross-plaintiff sought to avoid the contract on the basis of fraud. He did not pray for rescission of the contract for fraud, however, but sought damages based on breach. The court determined that by his prayer and petition as a whole, the cross-plaintiff affirmed the contract. Consequently, "[h]aving elected to treat the contract as valid and to recover damages on account of its breach, he could not maintain a suit for rescission. This is a well settled elementary principal." *Uvalde Constr.*, 126 S.W.2d at 24.

■ In the case before us, plaintiffs recovered twice under the judgment and were awarded inconsistent remedies. First, they

were restored to their original position by the return of their residence free of liens, a remedy available only upon rescission of the contract. Second, they were awarded $560,000 in monetary damages for the fraudulent taking of their property, a remedy arising from a breach of the contract.

Defendants assert that plaintiffs cannot recover damages in excess of the amount prayed for in the first amended original petition. Recovery exceeds the pleadings in two ways: (1) by awarding both the property and monetary damages for loss of the Chrystell property, when relief was sought in the alternative; and (2) by awarding actual damages of $460,000 against Paul Lyles and $100,000 against BTIC, when the only pleading for actual damages is for "damages equal to the value of the Chrystell property."

Plaintiffs counter that "a plaintiff is entitled to recover any and all damages to restore him as nearly as possible to his original status," citing *Sawyer v. Pierce,* 580 S.W.2d 117, 127 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). They argue that the evidence supports the jury finding of actual damages against Paul Lyles and BTIC. We disagree.

■ In this appeal, plaintiffs support the damages award with a number of claims that they never pled. Under TEX.R.CIV.P. 301, "[t]he judgment of the court shall conform to the pleadings." Plaintiffs are not entitled to recover back taxes, value of the certificates of deposit, legal fees incurred before suit was filed, or lost income because these claims were not pled.

In his pleadings, Jack Lyles prayed that the court award him (1) title free and clear of liens to the Chrystell property *or* damages in the amount of the value of the property, and (2) $500,000 in exemplary damages. We hold that, except for these two claims, the pleadings do not support any damages award.

■ Defendants assert that the award of exemplary damages against Paul Lyles was not supported by a finding of actual awareness. Exemplary damages for fraud in the

inducement may be awarded only if the person making the false representation does so "with actual awareness of the falsity." TEX. BUS. & COM.CODE ANN. § 27.01(c) (Vernon 1987). Defendants complain that question five on exemplary damages against Paul Lyles[4] was premised on the finding of fraud as defined in question two, and the finding that fraud was a proximate cause of damages in question three. The definition of fraud in question two allowed the jury to find fraud if a material misrepresentation was made recklessly without knowledge of its truth. Defendants argue that the jury was thus permitted to award exemplary damages without a finding of actual awareness.

The definition for fraud in question two read:

> By the term Fraud as used herein is meant a material respresentation [sic] made with knowledge of its falsity, or made recklessly without knowledge of its truth and as a positive assertion, with the intention that it should be acted upon by another party, that party acted in reliance upon it, and he thereby suffered injury.

Defendants submitted the following objection to question five:

> We would also object to Question No. 5 being submitted in that it is dependent upon 3 and also on 2 with respect to fraud on Bayou Terrace or Vernon Paul Lyles. There is no evidence in the record to support the submission of these issues.

This objection does not address the error defendants assert on appeal. At trial, they objected to question five based on legal sufficiency of the evidence to support its submission to the jury. On appeal, for the first time, they assert that the definition of fraud for the purposes of finding exemplary damages was incorrect. We hold that defendants waived their objection to the charge. *Mixon v. National Union Fire Ins. Co.,* 806 S.W.2d 332, 334 (Tex.App.—Fort Worth 1991, writ denied).

We sustain point of error three on the issues of inconsistent remedies, double recov-

---

4. The exemplary damage award of $375,000 against Bayou Terrace Corporation was not challenged on appeal.

ery, and damages in excess of the pleadings. We overrule point of error three on the issue of exemplary damages based on inadequate jury findings.

In point of error five, defendants assert that the trial court erred in failing to grant a judgment notwithstanding the verdict or new trial on their counterclaim for tortious interference with the earnest money contract to sell the Memorial property. Their counterclaim, although requested of the district clerk, was not included in the record. Our rules provide, "[t]he burden is on the appellant, or other party seeking review, to see that a sufficient record is presented to show error requiring reversal." TEX.R.APP.P. 50(d). Without the pleading setting forth their counterclaim, we cannot properly review the validity of defendants' claims. We hold that defendants waived their point of error five.

On motion for rehearing, appellants contend that the facts recited by this Court should include a statement that the "only reason the Memorial property sale fell through was the lis pendens filed by Jack Lyles, and the only reason the lis pendens was filed was to block that sale." However, lis pendens is a part of the judicial process and the resulting absolute privilege bars a suit for damages arising from the filing of the lis pendens. *Prappas v. Meyerland Community Improvement Ass'n,* 795 S.W.2d 794, 799 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Griffin v. Rowden,* 702 S.W.2d 692, 695 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Kropp v. Prather,* 526 S.W.2d 283, 287–88 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). We decline to expound further. Appellants have other avenues of relief if, as they claim, the lis pendens was wrongfully filed.

We reverse the judgment of the trial court on the award of actual damages and the reconveyance of 4701 Chrystell Lane free and clear of liens, remand that portion of the judgment to the trial court for an election of remedies pursuant to this opinion, and affirm the remainder of the judgment.

O'CONNOR, J., dissenting.

O'CONNOR, Justice, dissenting.

I dissent from the penultimate paragraph in the majority's opinion.

In their motion for rehearing, the appellants asked this Court to include in our opinion the statement that "the only reason the Memorial property sale fell through was the lis pendens filed by Jack Lyles, and the only reason the lis pendens was filed was to block the sale."

The majority does not challenge the statement on the ground that it is not correct. The majority seems to concede that it is correct, and responds with its statement that lis pendens, as part of the judicial process, provides an absolute privilege that bars a suit for damages. I disagree. I agree with Chief Justice Brown who dissented from one of the cases on which the majority relies. *Prappas v. Meyerland Community Improvement Ass'n,* 795 S.W.2d 794, 799 (Tex.App.—Houston [14th Dist.] 1990, writ denied), and I agree with him that the Dallas Court of Appeals erred in *Griffin v. Rowden,* 702 S.W.2d 692 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), another of the cases on which the majority relies.

The majority states that the appellants have other avenues of relief. I do not know what those could be.